IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TEENA DISANTIS, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| MORGAN PROPERTIES PAYROLL | : | NO. 09 - 6153 |
| SERVICES, INC. D/B/A MORGAN | : | |
| PROPERTIES, MITCHELL L. MORGAN | : | |
| MANAGEMENT, INC. and MITCHELL | : | |
| L.  MORGAN PROPERTIES LTD., | : | |
| Defendants | : | JURY TRIAL DEMANDED |

_____

## BRIEF OF DEFENDANT MORGAN PROPERTIES
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
_____

Schaun D. Henry
Attorney I.D. No. 80597
McNEES WALLACE & NURICK LLC
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108
(717) 237-5346
(717) 260-1702 facsimile

Attorneys for Defendants

## TABLE OF CONTENTS

Page

TABLE OF CITATIONS ..............................................................................iii

I.   PROCEDURAL HISTORY .......................................................................... 1

II.   FACTUAL HISTORY.................................................................................. 1

III.   QUESTIONS PRESENTED ....................................................................... 5

IV.   ARGUMENT .............................................................................................. 6

    A.   Summary Judgment Standard ......................................................... 6

    B.   Plaintiff Cannot Set Forth Facts Sufficient To Proceed To
        Trial On Her ADA Or PHRA Disability Claims ................................ 7

        1.   Plaintiff Cannot Prove That She Suffered an
            Adverse Employment Action Because of Her
            Disability ............................................................................. 8

        2.   Plaintiff Cannot Prove that She Suffered Retaliation
            Based on Any ADA or PHRA Protected Activity .................. 9

    C.   Plaintiff Cannot Make Out A Claim For FMLA
        Discrimination Or Interference........................................................ 11

    D.   Plaintiff's Failure To Set Forth Any Evidence Of The
        Amount And Extent Of Any Unpaid Overtime
        Compensation Worked During Her Employment With
        Defendants Is Fatal To Her Claim .................................................. 13

        1.   Plaintiff's Pleadings and Discovery Fail to Support
            Any Factual Basis From Which the Amount and
            Extent of Uncompensated Overtime May Be Inferred ........ 14

        2.   Plaintiff Has Offered Merely Conclusory, Factually
            Unsupported Allegations, Which Are Insufficient to
            Survive Summary Judgment on Her Claims of
            Unpaid Overtime ................................................................. 17

        3.   Even If Claimant Could Provide Sufficient Evidence
            to Shift the Burden to Defendants, the Time Records
            Defendants Produced Negate Any Inference That
            Plaintiff Worked Uncompensated Overtime "Almost
            Every Week" During Her Employment................................ 23

i

Page

          4.      Even if Plaintiff is Entitled to Overtime Wages, She is Time-Barred From Recovery Prior to January 12, 2008 ................................................................................ 24

V.      CONCLUSION ........................................................................... 25

## TABLE OF CITATIONS

Cases:                                                                                    Page

Abramson v. William Paterson College, 260 F.3d 265 (3d Cir. 2001) ........................... 10

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).................................................... 7

Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1986) ..................... 13,14,18,22,23

Barry v. Town of Elma, 2005 WL 711842 (W.D.N.Y. Mar. 28, 2005) ........................... 20

Bryant v. Aiken, 333 F.3d 536 (4th Cir. 2003) .................................................................. 6

Celotex Corp. v. Catrett, 477 U.S. 317 (1986).................................................................. 6

Colindres v. QuietFlex Mfg., 427 F. Supp.2d 737 (S.D. Tex. 2006) .............................. 13

Daniels v. Finish Line, Inc., 2008 WL 4814008 (E.D. Cal. Oct. 31, 2008) ..................... 17

E.G. Deame v. Pocono Med. Center, 142 F.3d 138 (3d Cir. 1998) ................................. 7

Erdman v. Nationwide Ins. Co., No. 07-3796 (3d Cir. 2009) .......................................... 12

Gatto v. Mortgage Specialists of Ill., Inc., 442 F. Supp.2d 529 (N.D. Ill. 2006).............. 17

Harris v. Healthcare Services Group, Inc., 2008 WL 2789534 (E.D. Pa.
     July 18, 2008) ......................................................................................... 18,19,22

Harvill v. Westward Communications, LLC, 433 F.3d 428 (5th Cir. 2005).................... 19

Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155 (3d Cir. 1990) .................................. 6

Jackson v. University of Pittsburgh, 826 F.2d 230 (3d Cir. 1982)................................... 9

Kelly v. Trexler University, 94 F.3d 102 (3d Cir. 1996)..................................................... 7

Kolesnikow v. Hudson Valley Hosp. Ctr., 622 F. Supp.2d 98 (S.D.N.Y. 2009)......... 20,22

Millington v. Morrow County Bd. of Commissioners, 2007 WL 2908817 (S.D.
     Ohio Oct. 4, 2007) ........................................................................................ 17

Oliver v. Centerpoint Energy, Inc., 2010 WL 2163915 (S.D. Tex. May 27, 2010) ......... 14

Prince v. MND Hospitality, Inc., 2009 WL 2170042 (S.D. Tex. July 20, 2009) .............. 13

Cases:  (cont'd)                                                                                    Page

R.W. Sims v. Mack Truck Corp., 488 F. Supp. 592 (E.D. Pa. 1980) ............................. 6

Rinehimer v. Cemcolift, Inc., 292 F.3d 375 (3d Cir. 2002)................................................ 8

Salley v. Circuit City Stores, 160 F.3d 977 (3d Cir. 1998) ............................................... 6

Simmons v. Wal-Mart Associates, Inc., 2005 WL 1684002 (S.D. Ohio July 19,
        2005) .................................................................................................. 21,22

Spangler v. Federal Home Loan Bank of Des Moines, 278 F.3d 847 (8th Cir.
        2002) .............................................................................................................. 11

White v. Washington Gas, 2005 WL 544733 (D. Md. Mar. 4, 2005)............................. 22

White v. Westinghouse Electric Co., 862 F.2d 56 (3d Cir. 1988) ................................... 6


Statutes:

29 U.S.C. §255(a) ........................................................................................................... 25


Rules:

29 C.F.R. §925.220(c)..................................................................................................... 12

Fed. R. Civ. P. 56............................................................................................................ 6
        56(c) ...................................................................................................... 6

## I. PROCEDURAL HISTORY

On or about December 28, 2009, Plaintiff Teena DiSantis filed a civil action Complaint alleging violations of the Americans With Disabilities Act, the Pennsylvania Human Relations Act, and the Family Medical Leave Act.  Plaintiff filed a First Amended Complaint on or about January 12, 2010.  Plaintiff presented the Complaint along with a Waiver of Summons which was executed on January 19, 2010.  Defendants Morgan Properties filed a timely Answer on February 24, 2010.  The matter was assigned to Senior Judge Robert F. Kelly who promptly entered a Scheduling Order dated March 9, 2010.  Discovery in this case ended on July 7, 2010.  Defendants now file the instant Motion for Summary Judgment.

## II. FACTUAL HISTORY

Plaintiff Teena DiSantis (hereafter "Plaintiff" or "DiSantis") was employed by Morgan Properties as a leasing consultant in July of 2006.  (Complaint, ¶15; Answer, ¶15).  Plaintiff was one of two leasing consultants employed at the residential facility known as Sherwood Crossing.  Plaintiff was responsible for leasing apartments, contacting maintenance on behalf of current residents to process work orders and performing periodic inspections of apartments prior to renting them.  Where it seemed that an apartment needed some repairs, Plaintiff was responsible for arranging the necessary maintenance.  Plaintiff was also responsible for other duties as assigned.  (Exhibit B (Job Description)).[1]  Plaintiff testified at deposition on May 13, 2010.  During the deposition, Plaintiff explained that she was taking daily medication that sometimes causes confusion and may cause her to forget things.  (Exhibit A, p. 7).

---

[1] Exhibit A is a compilation of excerpts from Plaintiff's deposition transcript.  All transcript references can be found in Exhibit A.

1

Plaintiff testified that she learned she suffered from bipolar disorder and panic disorder while employed with Morgan Properties.  She informed her supervisor, Sabina Chatterjee ("Chatterjee") that she suffered from bipolar disorder and panic disorder, and that she was taking medication for her disabilities.  Plaintiff informed Chatterjee of this fact within two months of her hire.  (Ex. A, p. 40).  Plaintiff did not request any form of accommodation when she informed Chatterjee of her alleged disorder.  Id.  Plaintiff requested FMLA leave on or about January 26, 2007 for a medical condition unrelated to her alleged mental disorders.  (Exhibit C).  Plaintiff did not qualify for FMLA leave since she had not been employed by her employer for at least twelve months.  Still, Defendants granted Plaintiff's leave request for the period from February 1, 2007 through February 9, 2007.  Although Plaintiff's leave was not FMLA qualifying, the Defendants required Plaintiff to use the FMLA certification form to verify her need for absence.  Defendants informed Plaintiff that she was to present her medical certification not later than her first day of leave.  Plaintiff returned to work on February 9, 2007 and received a warning notice from her supervisor, Chatterjee, for her lack of professionalism in failing to provide the required documentation as requested, as well as Plaintiff's response when questioned about the issue.  (Exhibit D).

In March of 2007, Plaintiff was absent from work on March 15 and 16 without authorization.  Plaintiff requested FMLA leave on or about March 16, 2007, this time for the alleged mental conditions for which she suffered.  (Exhibit E).  Plaintiff was not still not qualified for FMLA leave but was granted the leave from March 16 through March 30 of 2007.  Id.  Plaintiff's physician completed medical documentation which identified the onset of her panic disorder and bipolar disorder as March 16, 2007.  The medical

2

certification form went on to explain that Plaintiff's condition was expected to continue through March 30, 2007.  (Exhibit F).[2]  Upon her return to work, DiSantis received a written warning for failure to call in on the first day of her unscheduled absence in accordance with the Company policy.  (Exhibit G).

Plaintiff was absent from work on several other occasions throughout her employment but none of her absences were related to any alleged disability.  Moreover, although Plaintiff requested FMLA leave on two other occasions during her employment, she never returned any FMLA certification form to her employer after the certification form for her absences in May of 2007.  (Ex. A, p. 78).

At deposition, Plaintiff was asked how Chatterjee had discriminated against her with regard to her disability.  In response, Plaintiff alleged that Chatterjee knocked on her door (Plaintiff lived on-premises) and asked her "What's wrong, what did the doctor say." (Ex. A, p. 39).  Plaintiff also testified that Chatterjee did not know why Plaintiff was not at work.  (Ex. A, p. 75).  This is because of the fact that Plaintiff's initial absence was without permission.  Plaintiff was not on FMLA leave at the time of her March medical absence and the alleged actions by Chatterjee.  She had not yet presented any medical documentation at that time.

Plaintiff also alleged that Chatterjee yelled at her and was mean to her if she did something wrong.  On further questioning on this issue, Plaintiff admitted, however, that Chatterjee yelled at all employees:

> Q.  Okay.  How about when you said that Sabina acted a little
> differently towards you, describe what that means.  Did she yell at
> you?  Did she scream at you?

---

[2] Plaintiff also presented an unsigned doctor's note stating that she was under a doctor's care from 3/15/07 to 3/19/07.

> A.      Not just me, at everybody, but like when we were all in a group she would be yelling at us all, but it was like something … if I did something wrong, like if I didn't put the balloons out or something, she would just yell at the whole entire group and them balloons better be out.  And I'm like, okay.  Them balloons better be out on the tree in the morning time.  So I felt a definite negative from her.

(Ex. A, p. 49, ll. 1-13).

In addition to the two FMLA requests already mentioned in January of 2007 and March of 2007, Plaintiff also requested FMLA paperwork in August of 2007.  The request was for a nonwork-related injury but Plaintiff never took any time off nor did she ever return the FMLA form.  (Exhibit H).  Plaintiff did not provide a medical reason for her request for FMLA leave paperwork.

Plaintiff transferred to Brookmont Apartments at her own request to accommodate her child care needs in February of 2008.  At Brookmont Plaintiff was the only leasing consultant.  If she called off without notice, no one was there to do her work.  Plaintiff never informed her new manager, Billie Jo Sedlacek, of her alleged disability until two weeks before Plaintiff's termination.  (Ex. A, p. 51).

Sedlacek placed Plaintiff on a performance improvement plan in June of 2008 based on Plaintiff's work performance.  (Exhibit I).  Plaintiff continued to have performance-related problems at work, and in September of 2008 she was issued a final warning.  (Exhibit J).  The final warning was provided to her for failure to follow instructions, unsatisfactory job performance, and failure to obtain prior approval for absences for personal reasons.  Id.  On October 2, 2008, Plaintiff e-mailed Human Resources and requested FMLA leave paperwork.  (Exhibit K).  Plaintiff stated that she was going to see her doctor and might need FMLA leave.  She did not give a period of time for the beginning of her leave or a prospective end date of any leave that she might

take.  Morgan Properties requires employees to inform management of their first day of FMLA leave where such leave is foreseeable.  (Exhibit L).  Once again, FMLA paperwork was provided to her.  (Exhibit M).

DiSantis was absent from work on October 3, 2008 and failed to contact a manager personally at least one hour prior to the start of her shift to report off.[3] DiSantis failed to perform required move-in duties on October 4, 2008.  She also failed to phone in a resident's work order with regard to a leaking tub.  Then on October 8, Plaintiff failed to send maintenance to a resident's apartment after being told to do so by a supervisor.  (Exhibit N).  When asked about these issues, DiSantis explained that she simply forgot.  Id.  This is completely consistent with Plaintiff's deposition testimony that her anxiety medication made her forget.

DiSantis was discharged on October 10, 2008 for failing to follow instructions. DiSantis testified at deposition that she was aware the Company had an 800 number which she could use to report discrimination but she never chose to use it.  (Ex. A, p. 25).

### III.  QUESTIONS PRESENTED

A.  CAN PLAINTIFF SET FORTH FACTS SUFFICIENT TO PROCEED TO TRIAL ON HER CLAIM THAT DEFENDANTS DISCRIMINATED AGAINST HER AND RETALIATED AGAINST HER BECAUSE OF HER DISABILITY IN VIOLATION OF THE ADA AND THE PENNSYLVANIA HUMAN RELATIONS ACT?

Suggested Answer:  No.

B.  CAN PLAINTIFF SET FORTH FACTS SUFFICIENT TO SUPPORT HER CLAIM THAT SHE WAS SUBJECTED TO FMLA RETALIATION AND INTERFERENCE?

---

[3] Plaintiff was also absent on the second half of the day on October 2 and failed to follow procedure in order to request this time off.  (Ex. L).

Suggested Answer:  No.

C.  CAN PLAINTIFF SET FORTH FACTS SUFFICIENT TO ESTABLISH THAT SHE WAS NOT PAID OVERTIME WAGES FOR ALL HOURS WORKED FOR EMPLOYER IN EXCESS OF 40 HOURS PER WEEK?

Suggested Answer:  No.

## IV.  ARGUMENT[4]

### A.  Summary Judgment Standard.

The function of summary judgment is to avoid a useless trial.  R.W. Sims v. Mack Truck Corp., 488 F. Supp. 592, 597 (E.D. Pa. 1980).  Summary judgment is appropriate under the Federal Rules of Civil Procedure 56 ("Fed. R. Civ. P.") when there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Salley v. Circuit City Stores, 160 F.3d 977, 980 (3d Cir. 1998).

A disputed fact is not material unless its resolution could affect the outcome of the case.  A disputed fact is not genuine unless the evidence bearing on the disputed fact is such that a reasonable person could find for the nonmoving party.  Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155 (3d Cir. 1990).  In determining whether an issue of material fact exists, the court should consider all evidence in the light most favorable to the nonmoving party.  White v. Westinghouse Electric Co., 862 F.2d 56, 59 (3d Cir. 1988); Lance International Ltd. v. Menominee Paper Co., 1999 WL 482317, *3 (E.D. Pa. 1999) (Green, S.J.).  Nevertheless, a nonmoving party may not rely on conclusory

---

[4] Plaintiff's claims of disability discrimination under the Pennsylvania Human Relations Act and under the ADA arise out of the same set of facts.  The legal analysis is identical.  Bryant v. Aiken, 333 F.3d 536 (4th Cir. 2003).  We will consider these issues together for the purposes of brevity.

allegations in his pleadings or upon mere suspicion to assert the existence of a material disputed fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Once the moving party has carried its initial burden of showing that no genuine issue of material fact exists, the nonmoving party must establish the existence of every element necessary to his case.  Lance International Ltd., supra.

**B.**     **Plaintiff Cannot Set Forth Facts Sufficient To Proceed To Trial On Her ADA Or PHRA Disability Claims.**

The summary judgment analysis for disability based on discrimination claims proceeds under the McDonnell-Douglas burden shifting analysis.  McDonnell-Douglas v. Green, 411 U.S. 792 (1973).  First, Plaintiff must make out a *prima facie* case for disability discrimination.  Next, if Plaintiff meets that burden, Defendants must show a legitimate nondiscriminatory reason for its actions.  And finally, Plaintiff will have the opportunity to show that Defendants' reasons for their actions are pretext.  In order to prove discrimination under the ADA, Plaintiff must prove that (1) she has a nonjob-related disability; (2) she is a qualified individual; and (3) she suffered an adverse employment action because of that disability.  E.G. Deame v. Pocono Med. Center, 142 F.3d 138, 142 (3d Cir. 1998) (*en banc*).[5]  In the instant matter, the only medical information Plaintiff ever provided indicating that she suffers from a disability was an FMLA form filled out by her family doctor in March 2007.[6]  In that document, the physician identifies the fact that Plaintiff's condition is expected to last less than two

---

[5] The arguments supporting Defendants' Summary Judgment Motion regarding ADA claims are equally applicable to the PHRA.  Kelly v. Trexler University, 94 F.3d 102, 105 (3d Cir. 1996).

[6] Plaintiff did not produce any medical record indicating that she was treated for any disabilities during her employment during discovery.

weeks.  As such, Plaintiff has suffered at best from a temporary condition which was not protected under the ADA.  <u>Rinehimer v. Cemcolift, Inc.</u>, 292 F.3d 375 (3d Cir. 2002).

Every other instance of Plaintiff's absence was for some reason other than her alleged diagnosis of bipolar disorder and anxiety disorder.  It is undisputed that Plaintiff never presented her employer with any evidence of any long-term disability involving these conditions or any other condition.  Accordingly, Plaintiff is not protected by the ADA or the PHRA in this instance.  Plaintiff was neither disabled nor perceived as being disabled.  Indeed, she has not produced any evidence to show that her employer treated her as though it believed her to be disabled.  Plaintiff did not ask for any accommodation nor did the employer lower its expectations of her due to any perception of inability to perform.  Thus, Plaintiff cannot meet the first prong of her *prima facie* case in showing that she has a nonjob-related disability.

### 1. Plaintiff Cannot Prove That She Suffered an Adverse Employment Action Because of Her Disability.

Even if this Honorable Court determines that Plaintiff indeed did suffer from an nonjob-related disability, Plaintiff simply cannot present evidence that she suffered an adverse employment action because of her disability.  Rather, it was her poor work performance and lack of attention to detail that led to her discipline and eventual discharge.  Plaintiff received two write ups from Chatterjee because of her poor work performance.  In each instance, Chatterjee pointed out that Plaintiff failed to comply with her employer's requirements for reporting off.  In addition, Chatterjee addressed Plaintiff's lack of professionalism in failing to comply with her supervisor's demands.  That said, in each case that Plaintiff requested time off in January and March 2007, that time off was given to her.  This was so even though the employee was not qualified for

any form of FMLA leave nor did she have any other form of time off available to her. Thus, Plaintiff was provided with a reasonable accommodation at every turn.

Later, when Plaintiff went to Brookmont, she admitted that she was not subjected to any form of discrimination for the majority of her tenure by her new supervisor, Ms. Sedlacek.  Plaintiff stated that she believed Sedlacek discriminated against her only during the last two weeks of her employment.  This is because of the fact that Plaintiff allegedly informed Sedlacek that she was indeed suffering from disability during those last two weeks of her employment.  Still, the record is replete with discipline for poor work performance preceding the two weeks prior to Plaintiff's termination.  By the time Plaintiff actually was terminated, she had already been given a performance improvement plan and had been presented with a final warning.  Plaintiff's eventual termination came for failure to follow her employer's instructions as well as failure to follow through with maintenance requests and failure to properly call off work according to the Company's policies.  These were all issues Plaintiff had been warned about previously and had nothing to do with any alleged disability.  In the instant matter, Plaintiff simply cannot point to any link between her disability and her eventual discharge.  The employer set forth a legitimate nondiscriminatory reason for its actions and Plaintiff cannot point to any evidence of pretext.

### 2.   Plaintiff Cannot Prove that She Suffered Retaliation Based on Any ADA or PHRA Protected Activity.

In order to prove a *prima facie* case of retaliation, Plaintiff must prove that she engaged in a protected activity known to Defendant, that she suffered an adverse employment action, and a causal link between the two.   Jackson v. University of Pittsburgh, 826 F.2d 230 (3d Cir. 1982); Abramson v. William Paterson College, 260

F.3d 265 (3d Cir. 2001).  In the instant matter, Plaintiff cannot prove that she engaged in any form of protected activity.

During her deposition, Plaintiff admitted that she did not make any requests for an accommodation when she initially informed her employer about her disability.  In fact, later when Plaintiff asked for medical leave for which she was not qualified, the employer provided it regardless of the fact that it was not required to do so under the law.  Finally, Plaintiff does not dispute that nothing that occurred to her prior to the two weeks before her termination at the Brookmont facility was related to any form of discrimination.  When Plaintiff was finally informed of her termination, she explained that the employer tried to sit with her and speak about the disciplinary action that it was taking.  Plaintiff simply got up and walked out.  In her own words, Plaintiff explained her actions.

> She said, "Wait, wait, wait, wait, stay I need to talk to you, we need to talk about things."  I just got up and walked out.  I did not say anything else.

(Ex. A, p. 133, ll. 1-4).

Indeed, to the extent that Plaintiff alleges that she suffered any form of adverse action, that adverse action is clearly related to her poor work performance at the Brookmont facility for which she had been repeatedly warned prior to her supervisor even learning of her disability.

To the extent that Plaintiff alleges that the retaliatory actions she alleges occurred at the hands of Chatterjee, Plaintiff herself admitted that Chatterjee, while she may have yelled and screamed at Plaintiff for her poor performance, yelled and screamed at everyone when they performed poorly.  While we do not contend that this is a proper form of leadership on Chatterjee's part, even Plaintiff believes Chatterjee

treated everyone similarly.  Plaintiff did not suffer any form of adverse job action due to her alleged disability.  Plaintiff's ADA and disabilities-based PHRA claims should be dismissed in their entirety.

### C.   Plaintiff Cannot Make Out A Claim For FMLA Retaliation And Interference.

The FMLA does not provide an employee suffering from depression with a right to unscheduled and unpredictable but cumulatively substantial absences or a right to take such unscheduled leave at a moment's notice for the rest of her career.  On the contrary, such a situation implies that the employee is not qualified for a position where reliable attendance is a bona fide requirement.  Spangler v. Federal Home Loan Bank of Des Moines, 278 F.3d 847, 853 (8th Cir. 2002).  In the instant matter, the record is clear that DiSantis regularly requested FMLA leave.  It is also clear that on the only two occasions where she was out on medical leave, this medical leave was nonqualifying under the FMLA.  Still the employer accommodated Plaintiff at every turn asking only that she follow established call-off procedure.  This was of paramount importance because, at least at Brookmont, Plaintiff was the only leasing consultant and calling off in a timely fashion allowed her employer to find coverage for her.

It is also true that Plaintiff requested FMLA leave in August of 2007, but she does not contend that any negative action occurred to her because of that request.  Instead, Plaintiff alleges that her final request for FMLA leave paperwork in October 2008 engendered the employer's ire and was the reason for her discharge.  The facts, however, are that Plaintiff never went out on FMLA leave in that instance.  In fact, Plaintiff never went out on FMLA leave at any time during her employment.

The employer in this instance went out of its way to give Plaintiff leave on every occasion in which she requested time off.  By the time that Plaintiff was working at the Brookmont facility, she was the only leasing consultant working at that facility.  There were no other employees there to assist her.  Still, the employer provided Plaintiff with the FMLA paperwork she requested.  It is undisputed that the absences that Plaintiff engaged in on October 2 and October 3 were not FMLA qualifying.  Indeed, these absences had nothing to do with Plaintiff's FMLA requests in October.  The fact is that Plaintiff failed to call in in accordance with the employer's policy on October 2 and October 3.  The policy requires that Plaintiff specifically speak with a manager directly at least one hour before her shift to call off.  Plaintiff was unable to do so.  Moreover, Plaintiff's discharge was supported by her poor job performance for which she had previously been warned.

It is clear that the Third Circuit Court of Appeals has ruled that an employee need not necessarily take FMLA leave in order to invoke an interference or retaliation claim. Erdman v. Nationwide Ins. Co., No. 07-3796 (3d Cir. 2009).  The Erdman court pointed to the regulations surrounding the FMLA for the proposition that the FMLA prohibits employers from discriminating against employees or prospective employees who have used FMLA leave.  29 C.F.R. §925.220(c).  The court interpreted this provision as applying when an employee begins to invoke his or his rights for leave under the FMLA. Even so, DiSantis had a substantial record of discipline for poor work performance prior to her October FMLA request.  When she again performed poorly for the same issues for which she was previously disciplined, she was properly disciplined by her employer in the form of a termination.  The FMLA does not insulate employees from discipline for

poor work performance and where, as in this case, the employer is able to show that the discipline preceded any knowledge by the supervisor of any FMLA request, the employee's claim for FMLA retaliation must fail.

> **D.** **Plaintiff's Failure To Set Forth Any Evidence Of The Amount And Extent Of Any Unpaid Overtime Compensation Worked During Her Employment With Defendants Is Fatal To Her Claim.**

To establish a viable claim for overtime wages, the employee must prove that she has in fact performed work for which she was improperly compensated by producing sufficient evidence to show "the amount and extent of that work as a matter of just and reasonable inference." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88 (1986). Only once the employee has met her requisite burden of proof does the burden then shift to the defendant-employer. The defendant must set forth evidence of the precise amount of work that the plaintiff performed, or evidence "to negative the reasonableness of the inference to be drawn from the employee's evidence." Id. The employee's "[e]vidence of hours worked need not be perfectly accurate *as long as it provides a sufficient basis to calculate the number of hours worked*[.]" Prince v. MND Hospitality, Inc., 2009 WL 2170042 (S.D. Tex. July 20, 2009) (citing Colindres v. QuietFlex Mfg., 427 F. Supp.2d 737, 752-53 (S.D. Tex. 2006)). In explaining the plaintiff's burden, a federal district court recently noted that:

> it makes sense to examine whether there is, statistically speaking, enough evidence to support the inference, and to shift the burden of proof on an element of the plaintiffs' case (the number of hours worked) to the employer. See Secretary of Labor v. DeSisto, 929 F.2d 789, 794 (1st Cir. 1991) ("The evidence was simply inadequate to give rise to a 'just and reasonable inference' as to the amount and extent of undercompensated work."). Where employer payroll records are inadequate, litigants can only approximate the number of hours worked and the amount of pay due. *In*

> *such cases, the answer requires a numerical estimate of hours and pay.*

Oliver v. Centerpoint Energy, Inc., 2010 WL 2163915 (S.D. Tex. May 27, 2010)

(emphasis added).

> **1.    Plaintiff's Pleadings and Discovery Fail to Support Any Factual Basis From Which the Amount and Extent of Uncompensated Overtime May Be Inferred.**

Plaintiff cannot point to any specific damages to which she believes she is entitled.  Instead, in her Complaint, Plaintiff makes general requests for relief, including a vague claim of "any and all pay and benefits Plaintiff would have received," as well as liquidated and/or punitive damages.  (Compl. Count V, ¶¶ B-F).  Plaintiff's distinct inability to approximate or quantify overtime hours for which she was not compensated continued through discovery, despite Defendants' production of Plaintiff's time records for the duration of her employment.[7]  Despite Defendants' repeated requests during discovery, both in Interrogatories and in Deposition, Plaintiff has failed to provide any basis on which it is possible to calculate the number of overtime hours she allegedly worked.  "Plaintiff is unable to remember each and every week in which she worked overtime and was not paid at an overtime rate.  Plaintiff does claim that she regularly worked a Tuesday through Saturday schedule from approximately 8:50 am – 9:00 am to 5:30 pm – 6:00 pm."  (Exhibit O (Pl.'s Answers to Defs.' First Set of Interrogatories) at 6).  Further, Plaintiff's own testimony during deposition shows her inability to provide

---

[7] Defendants have produced Plaintiff's timesheets, which include time punch cards, handwritten time entries and computerized time entries, for the duration of her employment from July 2006 through her termination in October 2008.  Courts have applied the Mt. Clemens burden-shifting analysis where only some time records may be missing.  See Harris v. Healthcare Services Group, Inc., 2008 WL 2789534, at *3 (E.D. Pa. July 18, 2008).

any specificity regarding the amount and extent of uncompensated overtime that she now claims to have worked.

Q       I guess my question for you is, do you have specific weeks in which you believe you weren't paid overtime ... ?

A       No, it was pretty much every week, especially at the end of Sabina[ Chatterjee]'s employment there.  She made us come in – one of us come in at 8:30 and work all the way to six without overtime or any comp or anything....

Q        8:30 to six?

A       So that's like a half hour a day, because I took the 8:30.[8]

Q       So you think you had a half hour a day every week since the first time you moved in there?
A       No, not since the first time I moved in.

Q       Okay, from when?

A       From the last month or – like two months ... May and June of 2007ish – 2007.

Q        . . .  [A]ny time after that when you think you might have worked overtime and weren't paid or was it in those two months?

A       Just for the time I wasn't allowed to really take my full hour lunch.

Q       Which was what time?

A       A couple times a week I wasn't allowed to.  Like two times a week, like average.

Q       Two times a week for what period of time?

A       Until I went to Brookmont, and even at Brookmont from June to February.

* * *

Q       You weren't taking any lunch?

---

[8] As noted above, however, Plaintiff's Answers to Defendants' First Set of Interrogatories notes a regular start time of 8:50 am to 9:00 am, not 8:30 am.  (Ex. O at 6).

A       No, sometimes I wasn't able to get a lunch....

* * *

Q       Do you have any specific knowledge of what weeks you might actually be missing time in?

A       Almost every week.

* * *

Q       So there was some record, you did write down I came in at this time and I left at that time?

A       Yes.

Q       ... What about near the end of your employment with Morgan, let's say from January 2008 through October 2008, when you were terminated, were there times there where you didn't get paid as well for overtime?

A       Yes.  That was mostly at Brookmont.  I started in February.

Q       And what would have been the reasons for this overtime?

A       Just the lunches.  That's it.  I should have been paid.  If I wasn't taking my lunch, I think I should have been paid for that half hour or an hour[9] ...

(Ex. A, pp. 128-31).

As detailed by Plaintiff's deposition testimony, her claims largely are vague and generally assert only that she occasionally may have worked through all or part of a lunch break – with no definitive answer as to when or how much.  Plaintiff has failed to provide any specific evidence relating to days or pay periods in which she exceeded a 40 hour workweek.  Simply put, Plaintiff has offered no evidence – not even an approximation of potential damages – that provides any factual basis from which the amount and the extent of any uncompensated overtime hours may be inferred.  As the

---

[9] Plaintiff received a half an hour lunch at Sherwood and a full one (1) hour lunch at Brookmont.

cases detailed below illustrate, Plaintiff's proffered evidence is utterly insufficient to withstand a motion for summary judgment.

> **2.      Plaintiff Has Offered Merely Conclusory, Factually Unsupported Allegations, Which Are Insufficient to Survive Summary Judgment on Her Claims of Unpaid Overtime.**

Plaintiff cannot establish sufficient evidence of hours worked because she has not set forth any facts that provide a basis on which it is possible to calculate the number of hours of overtime she allegedly worked during the course of her employment with Defendants.  Instead, she has offered only vague allegations and conclusory statements that she "often worked more than 40 hours in weeks of her employment from the start of her employment [in 2006] until the end of her employment [in 2008]." (Compl. ¶ 43).  "Mere conclusory, factually unsupported allegations are insufficient to withstand a motion for summary judgment."   Millington v. Morrow County Bd. of Commissioners, 2007 WL 2908817, at *7 (S.D. Ohio Oct. 4, 2007) (noting that the plaintiff's bare allegation that he worked an average of five hours every week at home was insufficient to meet the burden of proof on his FLSA claim).  See Gatto v. Mortgage Specialists of Ill., Inc., 442 F. Supp.2d 529, 536 (N.D. Ill. 2006) (noting that plaintiff failed to offer sufficient evidence demonstrating genuine issue of material fact as to eligibility for overtime compensation where her support consisted of "declaration asserting without specificity that she worked more than 40 hours per week "nearly every week"); Daniels v. Finish Line, Inc., 2008 WL 4814008 (E.D. Cal. Oct. 31, 2008) (plaintiff's failure to provide any evidence "beyond bare allegations and vague undocumented estimates to support" his claim that he was not compensated for off the clock hours worked is "insufficient to survive summary judgment").

A 2008 decision from this District granted the defendant-employer summary judgment where the plaintiff-employees failed to provide sufficient evidence "to show the amount and extent of that work as a matter of just and reasonable inference."  Harris v. Healthcare Servs. Group, Inc., 2008 WL 2789534, at *5 (E.D. Pa. July 18, 2008) (citing Mt. Clemens, 328 U.S. at 687-88).  In Harris, the United States District Court for the Eastern District of Pennsylvania evaluated several employees' claims of uncompensated overtime.  Id. at *1.  Although various plaintiffs offered deposition testimony that created genuine issues of material fact as to whether at least some of the employees in fact performed uncompensated work, the Court granted summary judgment in favor of the employer "because no reasonable jury could conclude on the basis of the record ... that sufficient evidence exists 'to show the amount and extent of that work as a matter of just and reasonable inference.'"  Id. at *5 (quoting Mt. Clemens, 328 U.S. at 687-88)).  Specifically, the Court noted that two of the plaintiffs responded to defendants' request for the amount of damages they claimed were owed to them as follows: "Answering plaintiff seeks reimbursement for overtime payment and any and all other damages and money allowed by law."  Id. at *5.

The Harris Court found that the employees failed to provide any estimate of unpaid overtime.  Id.  The Court further noted that there was no evidence from which to determine the number of hours of unpaid overtime worked, if any.  Id. (noting testimonial evidence that two of the employees worked approximately "thirty hours of pay").  For periods in which the employees' time records were missing, the manager was an employee with whom the employees testified they had no problems.  Id.  Thus, the Harris Court found no evidence to support a basis upon which the amount and extent of

the plaintiff's allegedly unpaid overtime could be determined as a matter of just and reasonable inference.

Plaintiff similarly has provided no evidence to support a basis upon which the amount and extent of her unpaid overtime could be determined.  As noted above, the Complaint includes only general requests for relief, including a vague claim of "any and all pay and benefits Plaintiff would have received," as well as liquidated and/or punitive damages.  (Compl. Count V, ¶¶ B-F).  This language is remarkably similar to that in the Harris case, in which the Court found that the plaintiffs failed to offer any estimate of unpaid overtime.  Indeed, like the Harris employees, Plaintiff has provided no estimate whatsoever of the allegedly unpaid overtime or any approximation of the damages she now attempts to claim.  Thus, like the Harris Court, this Court should find that Plaintiff's evidence fails to support any basis upon which the amount and extent of her allegedly unpaid overtime can be determined.

Other federal courts also have found that plaintiffs who provided more particulars than Plaintiff has in the instant matter failed to meet the burden of producing sufficient evidence to show the amount and extent of uncompensated overtime work.  In 2005, the Fifth Circuit Court of Appeals granted defendant-employers summary judgment on plaintiff's FLSA claims for uncompensated hours worked even where the employee provided an estimate of unpaid hours worked.  The Court found that the plaintiff-employee offered "absolutely no evidence that she actually worked" the 210 hours of unpaid overtime that she asserted.  Harvill v. Westward Communications, LLC, 433 F.3d 428, 441 (5th Cir. 2005) (finding that the employee failed to raise a genuine issue of material fact where employee "presented no factual allegations at all to substantiate

her claim, and she presented no evidence of the amount or the extent of hours she worked without compensation").

In 2009, the United States District Court for the Southern District of New York found that the plaintiff-employee failed to offer the "concrete particulars" that are required of a plaintiff in order to defeat summary judgment.  Kolesnikow v. Hudson Valley Hosp. Ctr., 622 F. Supp.2d 98, 118 (S.D.N.Y. 2009).  The employee had, like Plaintiff, generally averred overtime worked and on occasion working through all or part of a lunch break.  Specifically, the Kolesnikow employee testified to the following:

> (1) two to four weeks per month, she worked an unspecified amount of time over 40 hours per week; (2) she "sometimes" worked through her half-hour lunch break once per week; and (3) she worked an unspecified amount of time past the end of her shift two or more times per week.

Id. at 118.  She failed, however, to provide any evidence as to the amount of time she worked each week – or when.  Id.  Further, the employee's testimony "did not provide a sufficient basis to infer that she worked more than 40 hours in any given week."  Id. (noting that the employee's regular schedule called for 36 hours per week not including lunch, and she could have worked at least four extra hours per week before exceeding 40 hours) (citing Barry v. Town of Elma, 2005 WL 711842, at *3 (W.D.N.Y. Mar. 28, 2005)).  The Kolesnikow Court found that the employee failed to provide any factual basis to support a finding that she worked uncompensated overtime.  Id. (noting that "there are cases in which FLSA plaintiffs have defeated summary judgment motions based on their own testimony, those plaintiffs have offered credible testimony approximating the number of hours they worked without pay").  Plaintiff, whose vague claims are similar to the Kolesnikow employee, similarly fails to provide any factual basis to support a finding that she worked uncompensated overtime.

The United States District Court for the Southern District of Ohio in 2005 evaluated the following evidence provided by the plaintiff of allegedly uncompensated "off the clock" work: "(1) approximately 92 times before clocking in for his shift, (2) approximately 92 times over his unpaid lunch break, and (3) approximately 55 to 60 times after clocking out at the end of his shift." Simmons v. Wal-Mart Associates, Inc., 2005 WL 1684002, at *10 (S.D. Ohio July 19, 2005). The Court found that Plaintiff failed "to support his assertions with any additional evidence.... In fact ... he fails to identify a single specific day on which this occurred." Id. The Simmons plaintiff also failed to offer any paychecks or paystubs as evidence to show the amount of hours for which the employer compensated him. Id. Accordingly, the Court found that his "bald assertion" that he worked off the clock over 200 times was insufficient to create a genuine issue of material fact as to whether the plaintiff was owed additional compensation. Id.

Plaintiff has offered even less evidence than the Simmons employee, who at least attempted to approximate the times he worked off the clock. Still, the Simmons employee, like Plaintiff, failed to support his assertions of uncompensated overtime with any additional evidence. As detailed above, Plaintiff varies between making bald assertions that she worked unpaid overtime "almost every week" to scattered claims that she may have worked through part of her lunch breaks "two times a week, like average" and that "[f]rom the last month or – like two months" of Chatterjee's employment she worked an extra half an hour." Like the Simmons employee, however, Plaintiff failed to identify a single specific day on which uncompensated overtime occurred. Indeed, Plaintiff provides no indication whatsoever in her pleadings,

deposition testimony, or discovery responses of any specific information regarding the amount or the extent to which she may have worked uncompensated overtime hours.

First, Plaintiff provides no measure of damages whatsoever. This likely is a direct result of Plaintiff's inability to provide a single specific day – much less several specific days, times or hours during her more than two (2) year employment with Defendants – on which she allegedly worked uncompensated overtime. Tellingly, Plaintiff does not even attempt to approximate the number of overtime hours that she claimed to have worked without compensation.[10] Instead, she attempts to hang her unsubstantiated claim for an indeterminate amount of damages solely on her testimony that fails to offer any specificity whatsoever beyond the general claims that she may have – on average – sometimes worked through part of her lunch break twice a week, and for two months may have started work half an hour early.

As illustrated by the case law above, including Kolesnikow, Simmons and this District's Harris decision, Plaintiff's meager offerings are woefully insufficient to meet her burden under the Mt. Clemens analysis. Not only has Plaintiff failed to assert any evidence suggesting the amount and extent to which she worked the alleged uncompensated overtime, but she declines to offer so much as an approximation of either uncompensated hours worked or potential damages. Indeed, Plaintiff has made no showing – beyond the bald assertion that she worked overtime during her

---

[10] Even in situations where the plaintiff alleges a specific number of uncompensated overtime hours worked, federal courts have dismissed the FLSA claim for insufficient evidence. See White v. Washington Gas, 2005 WL 544733, at *2 (D. Md. Mar. 4, 2005) (granting employer summary judgment where an employee alleged that he worked 291 hours during breaks and lunch periods, supporting claim with one affidavit that was contradicted by the employee's time sheets, which were available). Unlike the White employee, Plaintiff has failed to offer even an approximate amount of hours for which she claimed to have worked overtime without compensation.

employment – that either her early start time or her lunch break work constituted overtime at all. Thus, this Court should grant Defendants' Motion for Summary Judgment

        **3.**      **Even If Claimant Could Provide Sufficient Evidence to Shift the Burden to Defendants, the Time Records Defendants Produced Negate Any Inference That Plaintiff Worked Uncompensated Overtime "Almost Every Week" During Her Employment.**

Even if Claimant's sparse evidentiary offering could somehow meet the Mt. Clemens burden, which Defendants contend it cannot, the time records produced by Defendants belie Plaintiff's claims that she worked uncompensated overtime "almost every week" during her employment.     Under the Mt. Clemens analysis, the defendant must set forth evidence of the precise amount of work that the plaintiff performed, or evidence "to negative the reasonableness of the inference to be drawn from the employee's evidence."   Mt. Clemens, 328 U.S. at 687-88.   Contrary to Plaintiff's conclusory allegations, Defendants' time records provide evidence of the amount of work that Plaintiff performed during substantially all of her employment and the extent to which she did not work uncompensated overtime "almost every week" during her employment.  In contrast, a review of Defendants' proffered time records demonstrates that Plaintiff often worked even less than 40 hours during her employment.

Defendants' time records also reveal instances in which Defendants paid Plaintiff more than what the FLSA requires.  For example, Defendants frequently paid Plaintiff double time for certain hours worked on Sundays.  There were many weeks in which Plaintiff's receipt of the double time clearly resulted in Plaintiff being paid more than time-and-a-half for hours worked even though those hours were not in excess of 40

during the workweek.  Plaintiff's time sheet and Earnings Statement from time period ending October 6, 2006 provide an example.  Plaintiff worked a total of five (5) days in each of the two (2) weeks leading up to the October 6 end of the pay period.  (Exhibit P).  In each of the weeks, Plaintiff worked four (4) eight (8) hour days and then worked for four (4) hours on each Sunday for a total of 36 hours per week and 72 hours for the period.  Id.  Plaintiff's Earnings Statement for that period shows that she was compensated for an additional eight (8) hours at her regular rate of $10.00 per hour, which reflected double time for working on Sundays.  Id.  Accordingly, Plaintiff was compensated for 80 hours, when in fact she worked only 72 hours.

In April 2007, Plaintiff worked only 72 hours, but Defendants compensated her for two (2) 40 hour workweeks.  (Exhibit Q).  For pay period ending April 20, 2007, Plaintiff worked five (5) eight (8) hour days in the first week, for a total of 40 hours.  Id. The next week, however, Plaintiff worked only four (4) eight (8) hour days, for a total of 32 hours.  Id.  Plaintiff's total hours worked for the pay period amounted to 72 hours; however, Defendants compensated Plaintiff for working 80 hours.  Id.

Further, Defendants have engaged in a thorough review of Plaintiff's time records in an light of her assertions.  Defendants vehemently deny that Plaintiff worked uncompensated overtime.  In a good faith effort to remedy Plaintiff's perceived overtime, however, Defendants tendered to Plaintiff $296.52 via check on February 25, 2010. Accordingly, this Court should find that Plaintiff's unsupported claim that she worked overtime hours for which she was not compensated is moot.

### 4.    Even if Plaintiff is Entitled to Overtime Wages, She is Time-Barred From Recovery Prior to January 12, 2008.

Plaintiff filed her Amended Complaint alleging a claim for unpaid overtime wages on January 12, 2010.  The Fair Labor Standards Act provides that Plaintiff may not recover wages lost in excess of two years prior to the date on which her claim was filed.  29 U.S.C. §255(a).  Plaintiff cannot establish any set of facts by which she would be entitled to wages prior to January 2008.

## V.  <u>CONCLUSION</u>

For all of the foregoing reasons, we respectfully submit that summary judgment must be entered against Plaintiff and in favor of Defendants.  Plaintiff has failed to produce any facts to support her claims choosing instead to rely solely on her own subjective beliefs as to her allegations against her employer.  DiSantis was a poor performer who simply could not follow instructions.

McNEES WALLACE & NURICK LLC

By____*/s/ Schaun D. Henry*_____
        Schaun D. Henry
        100 Pine Street
        P.O. Box 1166
        Harrisburg, PA 17108
        (717) 237-5346
        (717) 260-1702 Facsimile

Date:  July  21, 2010                    Attorneys for Defendants

25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TEENA DISANTIS,                          :
       PLAINTIFF                     :
                                    :
     VS                                : NO. 09-6153
                                      :
MORGAN PROPERTIES PAYROLL                 :
SERVICES, INC., ET AL.,                   :
       DEFENDANTS                    : .

DEPOSITION OF:  TEENA DISANTIS

TAKEN BY:       DEFENDANT MORGAN PROPERTIES
                PAYROLL SERVICES, INC.

BEFORE:         HELENA L. BOWES, RPR
                NOTARY PUBLIC

DATE:           MAY 13, 2010, 10:45 A.M.

PLACE:          McNEES, WALLACE & NURICK
                570 LAUSCH LANE
                LANCASTER, PENNSYLVANIA



DEFENDANT'S
EXHIBIT

A

1   question, you have to answer the question, and then you

2   can say, hey, I need to take a break.  Okay?

3        A        Okay.

4        Q        The same thing goes for if you want to

5   consult with your counsel, or whatever else you want,

6   as long as there's not a question pending, you can do

7   that.

8                 As far as physical comfort is concerned,

9   are you very comfortable in the room here?

10       A        I am.

11       Q        I don't know if there's a lot I can do

12  about the temperature or anything like that, but I will

13  certainly try to do it.

14       A        I've got a sweater.

15       Q        If anything happens, we will try to bring

16  in a portable heater.  How is that?

17                As far as the questions I'm going to be

18  asking you today, some of these questions go back to a

19  period in time in 2006 and 2007, and they'll require

20  you to remember what occurred back in those days.

21                Have you taken any medication or anything

22  that might affect your ability to remember here today?

23       A        I take a daily medication that sometimes

24  causes confusion, sometimes.  So I may just forget some

25  things.

1    talked about leasing apartments, you know, good phrases

2    of what to say and not to say, how to prepare leases,

3    how to do marketing, like ideas, where to go.

4         Q         Who conducted your orientation?

5         A         I forget her name.  I don't remember her

6    name.

7         Q         If I said Jen Carreon, does that sound

8    right?

9         A         I know who that is.  I don't believe it

10   was Jennifer Carreon for my orientation.

11        Q         Did you get a copy of the company

12   handbook?

13        A         Yes.

14        Q         Did you read the handbook?

15        A         Yes.

16        Q         When you were in the orientation, do you

17   recall whether or not there was a discussion about the

18   company's policy against discrimination or harassment?

19        A         Yes.

20        Q         So that was discussed?

21        A         Yes.

22        Q         Do you know whether or not your employer

23   ever told you that there is an 800 number that you can

24   call to make complaints about your work?

25        A         Yes.

1     Q     When you first got diagnosed with this

2  mental health issue in March of 2007, did you have a

3  discussion with Sabina about it?

4     A     Yes.

5     Q     Tell me how that happened.  So the doctor

6  tells you what happened.  And then you did what?

7     A     It wasn't at that exact point.  It was

8  later on when I started feeling a little bit more

9  comfortable with her again to talk to her.  And also,

10  too, she would just -- other than the fact her knocking

11  at my door every single day, she would always ask me

12  what's the problem?  What's wrong?  What did the doctor

13  say?  I couldn't tell if she was asking me just to

14  self-satisfy her or if she was talking to me as a

15  friend.  So that's when I just came out and I had just

16  told her what the problem was about my bipolar and

17  panic disorder.

18     Q     So you told her this one day when she was

19  at your door?

20     A     No.  I never answered my door.  It was at

21  work one day.

22     Q     At work one day?

23     A     Yes.

24     Q     So this is March when you learn about it,

25  and you say you didn't tell her about it right away.

1          A        Yes.

2          Q        So would you say it was 30 days later, 60

3     days later?

4          A        It was right before she left.  Maybe about

5     two days later -- I meant two months later, I'm sorry,

6     not two days.

7          Q        So around May?

8          A        Around that time, I would say.

9          Q        When you told Sabina that you were

10    suffering from -- that you had a mental -- or a medical

11    issue, what did you tell her exactly, if you remember?

12         A        I told her that I suffered from bipolar

13    and panic disorders, and I had taken medication for

14    anxiety.  She asked me what kind of medication, and I

15    explained to her what kind of medication, the ABILIFY

16    and my Ativan.

17         Q        Did you ask her for anything in terms of

18    an accommodation?  Did you feel that you needed to have

19    certain duties relieved from you, or did you ask for

20    anything like that?

21         A        No.

22         Q        So you just had a discussion with her

23    about it?

24         A        Yes.

25         Q        How long a discussion was it?  Five

1      Q       Okay.  How about when you said that Sabina

2   acted a little differently towards you, describe what

3   that means.

4               Did she yell at you?  Did she scream at

5   you?

6      A       Not just me, at everybody.  But like when

7   we were all in a group, she would be yelling at us all,

8   but it was like something -- if I did something wrong,

9   like if I didn't put the balloons out or something, she

10  would just yell at the whole entire group, and them

11  balloons better be out.  And I'm like, okay.  Them

12  balloons better be out on the tree in the morning on

13  time.  So I felt a definite negative from her.

14     Q       So if you failed to do something, she

15  would address you about it directly in a group?

16     A       Yes.

17     Q       Did she ever address other people directly

18  in a group about their failures?

19     A       Yes.

20     Q       I mean, how would you describe Sabina's

21  demeanor?  Was she a mean manager?

22     A       Not exactly.  I mean, if you did something

23  wrong, she would get pretty mean.

24     Q       Okay.

25     A       Or if she felt as if you did something

1    wrong, she would get pretty mean.

2        Q        Was she somebody that you could go to and

3    discuss your problems?

4                 I mean, you had a discussion with her

5    about your disability.  At that point, did she tell you

6    anything about, hey, if you need anything, come let me

7    know, or anything like that?

8        A        I don't remember her ever saying something

9    like that.

10       Q        When you say you don't remember her saying

11   anything, are you saying she didn't say anything or you

12   just don't recall?

13       A        I don't recall.

14       Q        How about your co-workers?  You said

15   everybody started treating you differently.  This

16   Eileen person, did she treat you differently, too?

17       A        I didn't mean like co-workers, I meant

18   like the managers.  Eileen never treated me any

19   different than anybody.  She was someone I always had

20   trust and faith in.

21       Q        So while you were at Sherwood, Sabina

22   treated you differently.

23                What other manager treated you differently

24   while at Sherwood?

25       A        Nobody else at Sherwood.

1      Q       So then you moved to Brookmont.

2      A       Uh-huh.

3      Q       And while you were at Brookmont, did you

4    feel that people treated you differently because of

5    your disability?

6      A       When they found out about it, yes.

7      Q       So not until the two weeks before you were

8    getting ready to be terminated?

9      A       Yes.

10      Q       So you would say, from the time you

11   arrived at Brookmont in February of 2008, until the

12   time that you left Brookmont in October of 2008, the

13   only discrimination that you suffered, to your

14   knowledge, was in the last two weeks; is that correct?

15      A       I would say, yes.

16      Q       When you were at Brookmont, what managers

17   treated you differently because of your disability?

18      A       Billie-jo Sedlacek.

19      Q       Anybody else?

20      A       No.  She was my only manager there.

21      Q       If I asked you to name for me every person

22   at Morgan Properties who you believed discriminated or

23   retaliated against you, who would you say?

24      A       I would say the entire company for

25   terminating me.

1    work note for the period 3/15/07 to 3/19/07.  Take a

2    look at that.

3         A         (Witness complies.)  Okay.

4         Q         Do you remember providing this document to

5    your employer?

6         A         I believe I had them faxed, yes.

7         Q         And is it fair to say you were required to

8    provide this because the employer told you you were not

9    qualified for FMLA leave, but they could give you

10   medical leave?

11        A         Could you repeat that for me, please?

12        Q         Yes.  Is it fair to say that you were

13   required to provide this note because the employer told

14   you you were not qualified for FMLA leave, but they

15   would give you medical leave with a doctor's excuse?

16        A         Yes.

17        Q         Do you remember who your doctor faxed this

18   to?

19                  Did he fax it to Chatterjee or to

20   headquarters?

21        A         Headquarters.

22        Q         So at the time you faxed this note back to

23   headquarters, which is 3/19/07, Chatterjee doesn't yet

24   know why you're out; is that correct?

25        A         No.

```
 1        A        I don't remember.

 2        Q        Okay.

 3        A        I don't remember.

 4        Q        I showed you responses to what appear to

 5   be four requests for FMLA leave.  Okay?

 6        A        Yes.

 7        Q        I also showed you in Defendant's Exhibit

 8   4 -- pull Defendant's Exhibit 4 out, which is the

 9   certification that you actually returned to your

10   employer, it's the certification from March of 2010.

11        A        (Witness complies.)

12        Q        Do you know if you ever returned any form

13   other than this March 2007 form to your employer?  Did

14   you ever return any other FMLA form?

15        A        No.

16        Q        This is the only one?

17        A        Yes.

18        Q        Now, this form talks about absence from

19   3/10 to 3/30/2007.  Do you agree with me?

20        A        March 16th to March 30th.

21        Q        I'm sorry, I keep saying 3/10.  The first

22   page looks like ten.  So 3/16 to 3/30/07?

23        A        Yes.

24        Q        And during that time frame, do you agree

25   with me that your doctor had to do a doctor's note
```

1    says:  "During the earlier period of Plaintiff's

2    employment with Defendant, she punched in and out for

3    work such that overtime would be reflected therein."

4              I guess my question for you is, do you

5    have specific weeks in which you believe you weren't

6    paid overtime, or do you know when that is, or are you

7    saying I think it must have happened, or what are we

8    saying?

9         A         No, it was pretty much every week,

10   especially at the end of Sabina's employment there.

11   She made us come in -- one of us come in at 8:30 and

12   work all the way to six without overtime or any comp or

13   anything.  She said that's to be worked out with you

14   two.  We didn't like what she was saying, and Eileen

15   actually spoke up and said something.  She said, well,

16   if yous don't like it, yous can leave, they were her

17   famous words.

18        Q         8:30 to six?

19        A         So that's like a half hour a day, because

20   I took the 8:30.

21        Q         So you think you had a half hour a day

22   every week since the first time you moved in there?

23        A         No, not since the first time I moved in.

24        Q         Okay, from when?

25        A         From the last month or -- like two months,

1    I would say, of Sabina's employment there.  So May and

2    June of 2007ish -- 2007.

3         Q         May and June of 2007.  After May and June

4    of 2007, any time after that when you think you might

5    have worked overtime and weren't paid or was it in

6    those two months?

7         A         Just for the time I wasn't allowed to

8    really take my full hour lunch.

9         Q         Which was what time?

10        A         A couple times a week I wasn't allowed to.

11   Like two times a week, like average.

12        Q         Two times a week for what period of time?

13        A         Until I went to Brookmont, and even at

14   Brookmont from June to February.

15        Q         From June to February?

16        A         Yes.

17        Q         You weren't taking any lunch?

18        A         No, sometimes I wasn't able to get a

19   lunch.  We were just so busy, we weren't allowed to get

20   a lunch.

21        Q         Okay.

22        A         And if I was on lunch, sometimes I'd have

23   to stop eating lunch to go help customers and clients.

24        Q         Do you have any specific knowledge of what

25   weeks you might actually be missing time in?

1       A       Almost every week.

2       Q       Almost every week?

3       A       Almost every week.

4       Q       Okay.

5       A       I mean, I punched in and out for lunch and

6   everything.

7       Q       You punched in and out for lunch?

8       A       Yes.

9       Q       It was my understanding there wasn't a

10  punch in capability at every site you worked; is that

11  correct?

12      A       Correct.

13      Q       Sometimes it was just handwritten?

14      A       Yes.

15      Q       When it wasn't handwritten, that's when it

16  was punched in; correct?

17      A       Well, Brookmont, we just -- we just

18  flowed, we didn't do anything until the end of my

19  employment, they started like October 1st, like you

20  have to sign in the computer in and out for lunch and

21  in and out for the day.  But Sherwood, my whole

22  employment at Sherwood, we had to punch in and out on

23  timecards.

24      Q       In Brookmont, though, when you were at

25  Brookmont, were you ever required to fill out a piece

1    of paper that says how many hours you worked, this,

2    that and the other?

3         A         (Witness shakes head negatively.)

4         Q         No?  Did you have to fill out a sheet or

5    anything like that --

6         A         Yes.

7         Q         -- handwritten?

8         A         Yes.

9         Q         So there was some record, you did write

10   down I came in at this time and I left at that time?

11        A         Yes.

12        Q         You weren't paid this overtime.  What

13   about near the end of your employment with Morgan,

14   let's say from January 2008 through October 2008, when

15   you were terminated, were there times there where you

16   didn't get paid as well for overtime?

17        A         Yes.  That was mostly at Brookmont.  I

18   started in February.

19        Q         And what would have been the reasons for

20   this overtime?

21        A         Just the lunches.  That's it.  I should

22   have been paid.  If I wasn't -- if I wasn't taking my

23   lunch, I think I should have been paid for that half

24   hour or an hour, I could have really used the money as

25   a single mom.

1     She said it with an attitude and everything.

2          Q          "For the hours" meaning for the hours of

3     lunch?

4          A          For the hours of lunch and for coming in

5     at 8:30 in the morning and staying until six.  That's

6     when it all built up and we talked about our not

7     getting --

8          Q          An extra half hour?

9          A          Yes.

10         Q          Because in that instance, if I get this

11    straight, 8:30 to six is going to be nine and a half

12    hours, if you took an hour for lunch, it would be 30

13    minutes.  So it's 30 minutes every day during that time

14    frame?

15         A          Yes.

16         Q          And then later there were many times that

17    you didn't get to take lunches is what you're saying?

18         A          Yes.

19         Q          Looking today, can you pinpoint -- looking

20    at records of any type -- about when it was that you

21    weren't allowed to take lunch?  Did you write it down

22    on notepads, anything like that?

23         A          No.  I just had timecards at Sherwood

24    Crossing, that's it.  And if you were to look at the

25    timecards, they don't match up with the written



**Morgan Properties**
**Job Description**

**Job Title:** Leasing Consultant
**Reports To:** Property Manager
**Prepared By:** Human Resource
**Department:** Property Office

**FLSA Status:** Non -Exempt
**Prepared Date:** August  2004
**Updated:** March 2006

**Summary:** Performs all activities related to apartment rentals, move-ins, and lease renewals.  Interacts directly with prospective and current residents to achieve maximum occupancy.  Generates and handles traffic, leasing apartments, qualifying prospects, preparing lease documentation and completing move-in paperwork and procedures.  Assists residents throughout their tenancy.

**Essential duties and Responsibilities** includes the following. Other duties may be assigned:

- Interviews prospective tenants and records information to ascertain needs and qualifications.

- Accompanies prospects to model apartments and discusses size and layout of rooms, available facilities, such as swimming pool and fitness center, location of shopping centers, services available, and terms of lease.

- Completes lease form or agreement and collects rental deposit.

- Inspects condition of premises periodically and arranges for necessary maintenance.

- Compiles listings of available rental property.

- Composes newspaper advertisements.

- Responsible for setting up applicant files. Verifying qualifications and initial approval of paper work lease.

- Assure that applicant is set up properly and all monies processed within 24 hours.

- Responsible for presenting all applications to Manager for approval within 48 hours.

- Complete guest cards and record all traffic in computer daily.

- Daily updating and accuracy of traffic and application.

- Responsible for sending thank you notes, approval letters, phone calls and lease signing scheduling and sending welcome cards.

- Participate in any outside marketing events as required.

- Be familiar with the area; schools, churches, banks, shopping center, bus lines and recreational facilities.

- Support team in achieving the goals of the property

- Assist in mailing of outreach and events as required and distributes flyers and letters to residents if necessary.

DEFENDANT'S
EXHIBIT
B
ALL-STATE LEGAL®

- Walk tour routes, vacant units and make-readies on a daily basis
- Record all resident correspondence and submit to manager for review.
- Assist in preparing market surveys and shopping other complexes.
- Assist in promoting Morgan Properties communities.
- Assist manager with any requested work to be done on the property.
- Promote resident retention programs and adhere to Resident Retention Policy.
- Maintain courteous communications with residents, applicants and representatives of other companies.
- Be familiar and adhere to all fair housing laws.
- Maintain self-control and be congenial to all residents.
- Be fair and consistent in upholding all policies.
- Adhere to company policies.
- Maintain a "team spirit" and work well with the entire staff.
- Be flexible with hours and days worked.

Competencies: To perform the job successfully, an individual should demonstrate the following competencies:

- **Problem Solving** - Identifies and resolves problems in a timely manner.

- **Customer Service** - Manages difficult or emotional customer situations; Responds promptly to customer needs; Solicits customer feedback to improve service; Responds to requests for service and assistance; Meets commitments.

- **Oral Communication** - Listens and gets clarification; Responds well to questions.

- **Written Communication** - Writes clearly and informatively; Able to read and interpret written information.

- **Teamwork** - Balances team and individual responsibilities; Exhibits objectivity and openness to others' views; Gives and welcomes feedback; Contributes to building a positive team spirit; Able to build morale and group commitments to goals and objectives; Supports everyone's efforts to succeed.

- **Interpersonal Skills** - Focuses on solving conflict, not blaming; Maintains confidentiality; Listens to others without interrupting.

- **Quality Management** - Looks for ways to improve and promote quality; Demonstrates accuracy and thoroughness.

- **Ethics** - Treats people with respect; Keeps commitments; Inspires the trust of others; Works with integrity and ethically; Upholds organizational values.

- **Organizational Support** - Follows policies and procedures; Completes administrative tasks correctly and on time; Supports organization's goals and values.

- **Quality** - Demonstrates accuracy and thoroughness; Looks for ways to improve and promote quality; Applies feedback to improve performance; Monitors own work to ensure quality.

- **Adaptability** - Adapts to changes in the work environment; Manages competing demands; Changes approach or method to best fit the situation; Able to deal with frequent change, delays, or unexpected events.

- **Dependability** - Follows instructions, responds to management direction; Takes responsibility for own actions; Keeps commitments; Commits to long hours of work when necessary to reach goals; Completes tasks on time or notifies appropriate person with an alternate plan.

- **Safety and Security** - Observes safety and security procedures.

- **Attendance/Punctuality** - Is consistently at work and on time; Ensures work responsibilities are covered when absent.

**Qualifications:** To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skill, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

**Education and/or Experience**
High school diploma or general education degree (GED); or one to three months related experience and/or training; or equivalent combination of education and experience in sales. Sales and customer service training desirable.

**Language Skills**
Ability to read and comprehend simple instructions, short correspondence and memos
Organize data into letters, memos and reports.

Job requires that you talk to people outside the department individually or in a small group. Provide information to residents, potential residents and employees. Obtain information from residents, potential residents and employees - Speak clearly and be able to relay information.

**Mathematical Skills**
Ability to add, subtract two digit numbers. Multiply and divide one to two digit numbers.
Frequently required to calculate discounts, interests, commission, proportions and percentages.

**Reasoning Ability**
Ability to apply common sense. Furthermore understanding to carry out simple one or two-step instructions.

D0298

*This information must be given to the employee who is being placed on Family and Medical Leave or who has requested Family Medical Leave*

# MORGAN PROPERTIES

**160 Clubhouse Road, King of Prussia, PA 19406**
**Phone (610) 265-2800**          **Fax (610) 265-2417**

## Memo

**TO:**         Teena Marie Disantis, Sherwood Crossing

**FROM:**     Jennifer Carreon, Human Resources Assistant

**DATE:**     January 26, 2007

**SUBJECT:**  **Federal Family and Medical Leave Act**

Teena, it has been brought to my attention that due to a non-work related surgery you will be unable to work from February 1, 2007 until February 9, 2007. While you do not qualify for leave under FMLA you may qualify for unpaid medical leave. We wish you a speedy recovery and look forward to your return. Please read through the information below.

Please complete the *FMLA Leave Request Form*.  Also complete the top portion of the front page of the *Certification of Health Care Provider Form*.  Include the employee's name and department, or if applicable, the patient's name and relationship to the employee. The attending physician must complete the remainder.

Various medical conditions are appropriate for *Family and Medical Leave*, such as, heart conditions, pregnancy, childbirth, miscarriage, back problems, appendicitis, emphysema or continuing treatment for chronic or long-term health conditions.  Some conditions which would not be appropriate under *the Family and Medical Leave Act (FMLA)* are short-term conditions for which treatment and recovery are brief or the care of a child for illnesses such as colds or flu.

It is the responsibility of the employee to submit the completed forms to Human Resources within *15 days* of the time when the employee made the supervisor aware that he/she needs to be on extended medical leave which *may* qualify under the *Family and Medical Leave Act*.  Completed forms should be returned to:  **Human Resources, Morgan Properties, 160 Clubhouse Road, King of Prussia, PA 19406**

Outlined below is an explanation of the Family Medical Leave Act.

## FEDERAL FAMILY AND MEDICAL LEAVE ACT ("FMLA")

The Federal Family and Medical Leave Act provides eligible employees with up to 12 weeks of leave For the birth and care of a newborn child; For the placement of a son or daughter with the employee for adoption or foster care; to care for a spouse, parent or child with the serious health condition; or when the employee is unable to work because of a serious health condition.

*Eligibility*

To quality for federal Family and Medical Leave an employee must have 12 months of employment and 1,250 hours of work within the previous consecutive 12 month period and work at a location where at least 50 employees of your employer are working within 75 miles. *If you are ineligible for leave under FMLA, you may be eligible for an unpaid Medical Leave of Absence.*


DEFENDANT'S EXHIBIT

C

ALL-STATE LEGAL®

*Duration of Leave*

The maximum leave period is equal to 12 workweeks within a 12-month period.  Leave may be taken continuous, intermittent or on a reduced schedule.

*Type of Leave*

FMLA is considered an unpaid absence. In conjunction with your unpaid family leave, you must apply any paid, accrued leave; including vacation and sick time towards the total amount of family leave that you are entitled to under this regulation. Paid leave and FMLA leave run concurrently and will count toward your 12-work week allotment. For example, if the first week of your FMLA is paid vacation time, you will have eleven (11) weeks of unpaid leave remaining.

*Employee Responsibility*

The employee should notify Human Resources or their manager 30 days prior to the effective date of the family or medical leave, except when the need for the leave is not foreseeable, in which case the employee should provide notice as soon as practicable.

The employer may require an employee to submit medical certification from a licensed health care provider prior to commencement of the family or medical leave for the employee's own serious health condition.  Failure to provide certification will result in the denial of family or medical leave until certification is provided.

For your convenience I have attached a "Family or Medical Leave Request and Response Form" and "Physician Certification for Family or Medical Leave".  Please complete and return these forms to my attention.

*Benefit Continuation*

The employer must continue group health benefits (medical, dental, or other health plans) for employees on family leave, with both employer and employee paying the same share of the cost that they normally pay.  It is the employee's responsibility to make these payments on a bi-weekly basis.  Checks should be made payable to "Morgan Properties".  If you are receiving pay for accrued time off, deductions will be made directly from your paycheck.

*Restoration of Employment*

An employee returning to work must be restored to the same job or an equivalent job with equivalent pay, benefits and status.

<u>Rent payment while out on leave</u>

If residing on site, while on an unpaid leave of absence you are responsible for making monthly rent payments to the Morgan Properties community at which you reside. **Your discounted monthly rent payment is due by the first of each month.**  You will be notified of any outstanding balance on your account.

If you should have any questions or concerns, please do not hesitate to contact me at (610) 945-1534.

Revised January 2, 2007

## Summary of the Family and Medical Leave Act of 1993

The *Family and Medical Leave Act of 1993* (FMLA) was enacted August, 1993. It requires private employers to provide up to twelve weeks (60 work days; 480 work hours) of unpaid, job-protected leave per rolling calendar year to *eligible* employees for certain family and medical reasons. Employees are eligible if they have worked for Morgan Properties for at least one year *and* the employee has worked 1,250 hours during the immediate prior 12 months. Leave for part-time employees is given proportionate to the percent of time worked.

### Reasons for Taking Leave

An employer must grant unpaid leave to eligible employees for one or more of the following reasons:

- a serious health condition that makes the employee unable to perform their job;

- the care of the employee's child (birth, adoption or foster care; or

- the care of the employee's spouse, parent, step-parent, child, step-child who has a serious health condition.

- Certain types of paid leave may be substituted for unpaid leave at the option of the employee or the employer.

### Advance Notice and Medical Certification

- The employee should provide 30 days advance notice and medical certification.

- An employer may also require medical certification if the employee is unable to return from leave because of a serious health condition.

- An employer may require second or third opinions (at the employer's expense) and may require a release to return to work.

### Intermittent or Reduced Leave

- An employee may take intermittent leave or may work a reduced leave schedule to reduce the usual number of hours per day or work week.

- Subject to the approval of the healthcare provider, when planning medical treatment the employee should consult with the employer and make a reasonable effort to schedule the leave so as not to unduly disrupt department operations.

- Intermittent or reduced scheduled leave to care for a newborn child, adoption or foster care is subject to department head approval.

### Job and Benefits Protection

- Upon return from FMLA leave, employees must be returned to their original or equivalent position with equivalent pay, benefits and other employment terms.

- The use of FMLA leave cannot result in the loss of any employment benefit accrued prior to the start of the employee's leave.

- The use of unpaid FMLA leave cannot affect the exempt status of bonafide executive, administration and professional employees under the *Fair Labor Standards Act*.

- The employer must maintain the employee's medical insurance coverage under any *group health plan* for the duration of the FMLA leave. However, the employee is responsible to pay for the employee portion of the coverage.

- When the employee uses paid annual or sick leave under the provisions of FMLA, the payroll deductions of the employee portion of the premium continues.

Revised January 2, 2007

If the employee fails to return to work from FMLA, the employer may recover premiums paid to maintain the employee's health coverage.

## FMLA Does Not

- affect any federal or state laws prohibiting discrimination;

- supersede any state or local law which provides greater family or medical leave rights;

- discourage employers from adopting policies more generous than required by FMLA.

## Unlawful Acts by Employers

- FMLA makes it unlawful for an employer to:

- interfere with, restrain, or deny the exercise of any right provided under FMLA;

- discharge or discriminate against any person for opposing any practice made unlawful: and

- discharge or discriminate against any person because of involvement in any proceeding under or related to FMLA.

## Miscellaneous Provisions

- Employers must post a notice approved by the Secretary of Labor explaining rights and responsibilities under FMLA.  Any employer who willfully violates this requirement may be subject to a fine of up to $100 for each separate offense.

## Enforcement

- The *Secretary of Labor* is authorized to investigate and attempt to resolve complaints of violations and may bring an action against an employer in any federal or state court of law.

- The enforcement procedures of FMLA parallel those of the federal *Fair Labor Standards Act.*  The FMLA will be enforced by the Department of Labor's *Wage and Hour Division.*

- An eligible employee may bring a civil action against an employer for violations.

- Employers who act in good faith and have reasonable grounds to believe their actions did not violate FMLA may have any damages reduced to actual damages at the discretion of a judge.

*******************************************
*For additional information, contact Human Resources at (610) 945-1534.*

Revised January 2, 2007

**Family and Medical Leave Act (FMLA)**
**Employee/Supervisor Responsibilities and Information**

At the time the employee makes the supervisor aware of a request for leave for a reason that might qualify under *FMLA*, the supervisor should give the employee the application and related information.

- The *FMLA Request Form* may be completed by the employee, family member, or the supervisor.

- It is the responsibility of the employee, *not the supervisor*, to submit the (original) completed *Certification of Health Provider Form* (by the attending physician) to Human Resources within fifteen (15) calendar days; copies may be retained by the employee and supervisor.

- Failure to submit the appropriate paperwork to Human Resources within the 15 calendar day time frame may result in the denial of *FMLA* leave.

- The supervisor has an option of putting the employee on *Provisional FMLA* leave to avert the use of more leave than necessary from work.  Please call Human Resources for additional information.

- The employee must have worked for Morgan Properties for at least 12 months and must have worked 1,250 hours during the previous 12 months.  Leave for part-time employees is given proportionate to the percent of time worked.

- Human Resources will:

1. determine the 1,250 hours eligibility requirement,
2. calculate the available leave,
3. verify the certification of the required documentation by the attending physician,
4. send written confirmation to the employee and supervisor or department head documenting the approval or /disapproval of the request for *FMLA* leave with effective date and any current accrued leave balances.

- Follow up medical documentation may be requested of the employee **only** by Human Resources during the time the employee is on leave.

- If an *intermittent* or *reduced work* schedule is requested, it must be discussed and developed by the employee and the supervisor, maintaining the plan at the department. **An *intermittent* or *reduced schedule* of leave for birth, adoption or foster care of a child is subject to approval by the department head.**  Contact Human Resources for assistance.

- If the employee is on unpaid approved *FMLA* leave, it will be his/her responsibility to pay the employee portion of the monthly health care premium to Morgan Properties.

## Employees Use of Accrued Leave While On Family And Medical Leave

- In conjunction with your unpaid leave under FMLA, you may elect to take your accrued vacation and/or sick leave to count toward your family leave.  However, both paid leave and the FMLA leave will count toward your 12-work week leave allotment.

- If the employee does not return to work after 12 weeks of leave, Morgan Properties may then seek to recover the health insurance contribution for the period of leave-without-pay.

- At the end of the *FMLA* leave, the employee will be reinstated to the original or equivalent position.

Revised January 2, 2007

- For the birth, adoption or foster care placement of a child, the parents may only use twelve weeks of combined leave.  They are not each entitled to twelve weeks of *FMLA* leave.

**Reporting Leave and Leave Usage**

- The employee has the option of using applicable leave balances including vacation, sick, sick bank time while on approved *FMLA* leave. The hours will be deducted from the employee's *FMLA* leave annual entitlement.

- An eligible employee may take up to 12 weeks of unpaid leave or use applicable leave balances (sick, vacation, banked sick)

- If an employee is found ineligible for *FMLA* leave, standard leave policies will apply.

- If the employee is unavailable to complete the *Time Sheet*, the supervisor should complete it, and enter leave on the leave system.

- Under the *Sick Days Policy*, employees may use up to 40 hours of *Sick Leave* per calendar year.

Revised January 2, 2007



# Morgan Properties

## Employee Warning Notice

| Employee Information | |
|---|---|
| Employee Name: Teena DiSantis | Date: February, 9, 2007 |
| Employee Property: Sherwood Crossing | Job Title: Leasing Consultant |

| Type of Warning | | |
|---|---|---|
| X First Warning | ☐ Second Warning | ☐ Final Warning |

| Type of Offense | | |
|---|---|---|
| ☐ Tardiness/Leaving Early | ☐ Absenteeism | ☐ Violation of Company Policies |
| ☐ Substandard Work | ☐ Violation of Safety Rules | ☐ Rudeness to Customers/Coworkers |
| X Other: Lack of Professionalism | | |

### Details

**Description of Infraction:**

Teena was given forms to be completed by her doctor on 1/26/07. She was specifically told that the forms were due no later that the first day of her leave 2/1/07. Teena agreed to have the forms turned in. She was then reminded on two occasions about the forms. Upon being reminded the day the forms were due, Teena began to act erratic and loudly stated "when was she supposed to get the forms filled out when she was busy working and doing other stuff". It was explained to Teena that it was her responsibility to have the forms completed and returned timely as indicated. On the doctor's note provided prior to her leave for surgery, it was indicated that Teena would be out of the office from 2/1-2/9/07. Teena returned to the office on 2/9/07 and worked until 3:40PM at which time she requested to change her pants due to being uncomfortable. I approved her leaving to go home to change as she lives on site. Teena then further requested to also go to pick up her prescription but indicated that her travel time would exceed her lunch break. She was told that she could change and take lunch but would not be able to get her prescription during that time. Teena became irate and began vocalizing her frustrations very loudly and in an unprofessional manner. She yelled that she was not to be working that day (per the forms her doctor completed) and was instructed to leave.  Teena worked on 2/9/07 although she was not supposed to per her doctor's orders. Teena made no attempt to contact me or communicate this information to me during the period of her leave from 2/1-2/9/07 to make alternate scheduling provisions.

**Plan for Improvement:**

Teena is expected in the future to discuss and express her leave in a timely and rational manner. She is expected to display professionalism and respect towards others.

**Consequences of Further Infractions:**

Additional disciplinary action up to and including termination of employment.

### Acknowledgement of Receipt of Warning

*By signing this form, you confirm that you understand the information in this warning. You also confirm that you and your manager have discussed the warning and a plan for improvement. Signing this form does not necessarily indicate that you agree with this warning.*

Teena Marie DiSant _____ 2/12/07
**Employee Signature** _____ Date

Debra Chatterjee _____ 2/12/07
**Manager Signature** _____ Date



DEFENDANT'S EXHIBIT
D

*This information must be given to the employee who is being placed on Family and Medical Leave or who has requested Family Medical Leave*

# MORGAN PROPERTIES

**160 Clubhouse Road, King of Prussia, PA 19406**
**Phone (610) 265-2800                Fax (610) 265-2417**

## Memo

**TO:**          Teena Marie Disantis, Sherwood Crossing

**FROM:**     Jennifer Carreon, Human Resources Assistant

**DATE:**      March 16, 2007

**SUBJECT:**   **Federal Family and Medical Leave Act**

---

Teena, it has been brought to my attention that due to a non-work related injury/illness you will be unable to work from 3/16/2007 until 3/30/2007. While you do not qualify for leave under FMLA you may qualify for unpaid medical leave. We wish you a speedy recovery and look forward to your return. Please read through the information below.

Please complete the *FMLA Leave Request Form*. Also complete the top portion of the front page of the *Certification of Health Care Provider Form*. Include the employee's name and department, or if applicable, the patient's name and relationship to the employee. The attending physician must complete the remainder.

Various medical conditions are appropriate for *Family and Medical Leave*, such as, heart conditions, pregnancy, childbirth, miscarriage, back problems, appendicitis, emphysema or continuing treatment for chronic or long-term health conditions. Some conditions which would not be appropriate under *the Family and Medical Leave Act (FMLA)* are short-term conditions for which treatment and recovery are brief or the care of a child for illnesses such as colds or flu.

It is the responsibility of the employee to submit the completed forms to Human Resources within *15 days* of the time when the employee made the supervisor aware that he/she needs to be on extended medical leave which *may* qualify under the *Family and Medical Leave Act*. Completed forms should be returned to:  **Human Resources, Morgan Properties, 160 Clubhouse Road, King of Prussia, PA 19406**

Outlined below is an explanation of the Family Medical Leave Act.

## FEDERAL FAMILY AND MEDICAL LEAVE ACT ("FMLA")

The Federal Family and Medical Leave Act provides eligible employees with up to 12 weeks of leave For the birth and care of a newborn child; For the placement of a son or daughter with the employee for adoption or foster care; to care for a spouse, parent or child with a serious health condition; or when the employee is unable to work because of a serious health condition.

*Eligibility*

To quality for federal Family and Medical Leave an employee must have 12 months of employment and 1,250 hours of work within the previous consecutive 12 month period and work at a location where at least 50 employees of your employer are working within 75 miles. *If you are ineligible for leave under FMLA, you may be eligible for an unpaid Medical Leave of Absence.*



DEFENDANT'S EXHIBIT
E
ALL-STATE LEGAL®

03/19/2007   08:09   6182652417                    HUMAN RESOURCES                         PAGE   02

Note: After making the supervisor aware that the employee needs leave for a reason that might qualify FMLA Leave, it is the responsibility of the employee to obtain from the physician the completed *Certification of Health Provider Form* and return to Human Resources within fifteen (15) days.

Revised 4/18/2003



## Certification of Health Care Provider Form
### Family and Medical Leave Act of 1993

| Employee's Name: | Patient's Name (if different from employee) |
|---|---|
| **Teena Marie Disantis** | |
| Property: | Patient's Relationship to Employee: |
| **Sherwood Crossing** | |

Do you believe the physical presence of the employee named above is necessary or beneficial in the care of the patient?

☐ Yes    ☐ No              If Yes, for how long?   *Same*

The Following is to be Completed by the Attending Physician or Practitioner:
The information requested on this form relates only to the *serious health condition* for which the employee is requesting leave under the Family and Medical Leave Act. *Please check the applicable category of the patient's qualifying condition. NOTE Definitions on Reverse Side of This Form*

☐ **Hospital Care**        Admission to Hospital Date: _____      Discharge Date: _____

☑ **Acute Condition  (Absence Plus Treatment)**

☐ **Birth of a Child**     Estimated Date of Delivery _____

                ☐ Request for Mother          ☐ Request for Father

☐ **Chronic/Permanent**  Expected frequency of absence: _____ days per month
                Lasting _____ hours per absence

1.  The attached sheet describes what is meant by a **"serious health condition"** under the Family and Medical Leave Act. Does the patient's condition qualify under any of the categories described? If so, please check the applicable category.
    (1)____  (2)____  (3)____  (4) ✓  (5)____  (6)____ , (7)____ , (8)____ , (9)____  or None of the Above_____

2.  Describe the **Medical Facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of these categories[1].
        *Severe anxiety and panic disorder*

3 a. State the approximate date the conditional commenced, and the probable duration of the condition (and also the probable duration of the patient's present incapacity[2] if different):   *3/16  ~  3/30/07*

---

[1]. Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery there from.

Revised January 2, 2007



DEFENDANT'S EXHIBIT

F

ALL-STATE LEGAL®

03/19/2007   08:09   6102652417                    HUMAN RESOURCES                    PAGE   04

c.   If the condition is a chronic condition (condition # 8) or pregnancy, state whether the patient is presently incapacited[2] and the likely duration and frequency of episodes of incapacity[3]:

*3 - 16   →   3 → 30/??*

4.a.  If additional treatments will be required for the condition, provide an estimate of the probable number of such treatments:

*medical revaluation*

If the patient will be absent from work or other daily activities because of treatment on an intermittent or part-time basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any: *unknown*

b.        If any of these treatments will be provided by another provider of health services (e.g., physical therapist), please state the nature of the treatments:

c.        If a regimen of continuing treatment by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment):

*medical evaluation / medicines*

5.a.  If a medical leave is required for the employee's absence from work because of the employee's own condition (include absences due to pregnancy or a chronic condition), is the employee unable to perform work of any kind?
    (YES)          NO

b.    If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job (the employee or the employer should supply you with the information about the essential job functions)?
              YES          NO

If yes, please list the essential functions the employee is unable to perform:

*Anxiety , panic disorder.*

c.   If neither a. nor b. applies, is it necessary for the employee to be absent from work for treatment?
              YES          NO

6.a.  If leave is required to care for a family member of the employee with a serious health condition, does the patient require assistance for basic medical or personal needs or safety, or for transportation?
              YES          NO

b.    If no, would the employee's presence to provide psychological comfort be beneficial to the patient or assist in the patient's recovery?
              YES          NO

c.    If the patient will need care only intermittently or on a part-time basis, please indicate the probable duration of this need:

Revised January 2, 2007

_Anthony Mannino, MD_

Print or Type Name of Healthcare Provider:

_1 Summore W_
_Levittown, PA   19055_

Signature of Healthcare Provider:

Type of Practice: _Internal Medicine_

Street and Mailing Address: _as above_

Telephone Number: _(215) 945 - 8400_

FAX Number: _(215) 945 - 9328_

Physician Signature:

Date _3/27/07_

Please Return the Completed Form to:
**Human Resources**
160 Clubhouse Road, King of Prussia, PA 19406
-Or-
Fax: 610-265-2417

Revised 4/17/2003

03/15/2007   05:05   6102557417   HUMAN RESOURCES   PAGE   03

b.    Will it be necessary for the employee to work only intermittently or to work on a less than full schedule as a result of the condition (including for treatment described in item 6 below)?

YES          NO

If yes, give the probable duration:

Revised January 2, 2007

**P13**



Morgan Properties

## Employee Warning Notice

| Employee Information | |
|---|---|
| Employee Name: Teena DiSantis | Date: 3/15/07 and 3/16/07 |
| Employee Property: Sherwood Crossing – 9013 | Job Title: Leasing Consultant |

### Type of Warning

| ☐ First Warning | X Second Warning | X Final Warning |
|---|---|---|

### Type of Offense

| ☐ Tardiness/Leaving Early | X Absenteeism | X Violation of Company Policies |
|---|---|---|
| ☐ Substandard Work | ☐ Violation of Safety Rules | ☐ Rudeness to Customers/Coworkers |
| ☐ Other: _____ | | |

### Details

**Description of Infraction:**
Regular and prompt attendance on each scheduled workday is essential. Teena was a "no call, no show" to work on Thursday, March 15th and the morning of Friday, March 16th. On Friday afternoon Teena did contact Krista Reynolds, HR Director to discuss her situation. Krista then notified me and Debbie Quigley. Failure to notify us of your absence in a timely fashion results in short staffing on the site which prevents us from meeting our business objectives.

**Plan for Improvement:**
Per the Morgan Properties Employee Handbook of Company Policies, page 23, "In the event of an unscheduled absence, such as an illness or emergency, employees are required to contact their immediate supervisor at least one hour prior to the start of their shift. ... If an employee is unable to reach their immediate supervisor, they should contact the next designated manager until speaking with someone personally. Voice mail messages are not acceptable."

Teena is to adhere to all Morgan Policies and Procedures as outlined in the Morgan Properties handbook and as outlined by her Property Manager.

**Consequences of Further Infractions:**
Further infractions will result in additional disciplinary action up to and including termination.

### Acknowledgement of Receipt of Warning

*By signing this form, you confirm that you understand the information in this warning. You also confirm that you and your manager have discussed the warning and a plan for improvement. Signing this form does not necessarily indicate that you agree with this warning.*

| Employee Signature | Date 4-10-07 |
|---|---|
| Manager Signature | Date 4/10/07 |
| Regional Manager Approval | Date: |

| Witness Signature (if employee understands warning but refuses to sign) | Date 4/10/07 |
|---|---|

**DEFENDANT'S EXHIBIT**
6

ALL-STATE LEGAL®

> *This information must be given to the employee who is being placed on Family and Medical Leave or who has requested Family Medical Leave*



# MORGAN PROPERTIES

### 160 Clubhouse Road, King of Prussia, PA 19406
### Phone (610) 265-2800          Fax (610) 265-2417

## Memo

**TO:**       Teena Disantis, Sherwood Crossing

**FROM:**   Jennifer Carreon, Human Resources Assistant

**DATE:**    August 28, 2007

**SUBJECT:**   **Federal Family and Medical Leave Act**

---

Teena, it has been brought to my attention that due to a non-work related injury or illness, you may be unable to work for a period of time. We will assign you leave under FMLA pending the completion of the attached paperwork. Please read through the information below.

Please complete the *FMLA Leave Request Form*.   Also complete the top portion of the front page of the *Certification of Health Care Provider Form*.  Include the employee's name and department, or if applicable, the patient's name and relationship to the employee.  The attending physician must complete the remainder.

Various medical conditions are appropriate for *Family and Medical Leave*, such as, heart conditions, pregnancy, childbirth, miscarriage, back problems, appendicitis, emphysema or continuing treatment for chronic or long-term health conditions.  Some conditions which would not be appropriate under *the Family and Medical Leave Act (FMLA)* are short-term conditions for which treatment and recovery are brief or the care of a child for illnesses such as colds or flu.

It is the responsibility of the employee to submit the completed forms to Human Resources within *15 days* of the time when the employee made the supervisor aware that he/she needs to be on extended medical leave which *may* qualify under the *Family and Medical Leave Act*.  Completed forms should be returned to:  **Human Resources, Morgan Properties, 160 Clubhouse Road, King of Prussia, PA 19406**

Outlined below is an explanation of the Family Medical Leave Act.

## FEDERAL FAMILY AND MEDICAL LEAVE ACT ("FMLA")
The Federal Family and Medical Leave Act provides eligible employees with up to 12 weeks of leave For the birth and care of a newborn child; For the placement of a son or daughter with the employee for adoption or foster care; to care for a spouse, parent or child with a serious health condition; or when the employee is unable to work because of a serious health condition.

*Eligibility*
To quality for federal Family and Medical Leave an employee must have 12 months of employment and 1,250 hours of work within the previous consecutive 12 month period and work at a location where at least 50 employees of your employer are working within 75 miles. *If you are ineligible for leave under FMLA, you may be eligible for an unpaid Medical Leave of Absence.*



**DEFENDANT'S EXHIBIT**

*H*

ALL-STATE LEGAL®

# Memo

**Date:** 06/11/2008

**To:** Teena Disantis

**Re:** Action Plan

**Cc:** Debbie Quigley

**From:** Billie-jo Sedlacek, Brookmont Apartments

On April 23, 2008, I provided you with a memo in regards to Leasing Procedures to be followed. This memo was provided due to the fact that we are at a critical point in the leasing season. Brookmont's occupancy is currently 90.91% and we are budgeted to be at 95%. Listed below is the Action Plan that must be followed over the next thirty days. This action plan highlights the areas that need to be implemented and maintained consistently going forward.

## INCREASE OCCUPANCY:

1. Guest Cards are to filled out for each prospect and gather as much prospect information as possible (ie. address, phone numbers, email addresses, etc.);
2. Guest cards must be reviewed daily;
3. Follow – up must be completed within 24 hours of initial visit;
4. Five follow – ups must be completed with each guest and this must be done in a timely manner;
5. Meet with property manager daily to discuss previous days traffic and what follow up efforts have/will be made. We will review objections and set goals for obtaining leases.
6. Mini Model 1 unit of each unit type vacant, once that apartment is rented, then the next target apartment must be set up as a mini – model;
7. Freshen each mini model daily;
8. Balloons at each entranceway to lead the prospects from this entrance to the leasing office.
9. Weekly marketing, (tabbed flyers from Allen and Goel);
10. Create outreach binder to record all visits and materials sent or delivered to places that have been marketed to.

## CLOSING RATIO

During this time of occupancy struggle, it is important to maintain focus on getting traffic and closing at least 40% of the traffic. It is more critical now than ever that we generate high closing ratios. This can be done with consistent marketing and follow up with traffic. We need to capture each and every lead that comes our way as we cannot afford to miss our on any opportunities in what is a very competitive market. In order to be successful, you must be FULLY committed to doing everything possible to ensure that we meet our goals.

## ATTENDANCE

Daily attendance is crucial to job performance. You are required to be at work during normal scheduled hours. Vacation/Sick time must be approved in accordance with Morgan SSOP.


DEFENDANT'S EXHIBIT

ALL-STATE LEGAL®

I

## OVERALL GOAL

Teena, this action plan has been developed specifically to outline procedures necessary to perform your job successfully. Our goal is to meet budgeted occupancy and to increase your closing ratio to 40-50%. By following this action plan above it is expected that you will be able to fulfill this.

## FOLLOW UP ACTION PLAN

Teena, as Leasing Consultant at Brookmont, it is your responsible to lease apartments and to maintain focus on getting traffic and closing at least 40% of the traffic. It is more critical now than ever that we generate high closing ratios. This can be done with consistent marketing and follow up with traffic. We need to capture each and every lead that comes our way as we cannot afford to miss any opportunities in what is a very competitive market. In order to be successful, you must be FULLY committed to doing everything possible to ensure that we meet our goals.

You are hereby on notice that immediate correction is needed on the above issues and implementation of this action plan must be made. As a result, it is expected that you follow through with this entire plan over the next thirty days.

*Morgan Properties (Employee handbook) Page 17 & 18 Disciplinary Action*
*Major Infraction.( Unsatisfactory work performance, including but not limited to,*
*(Failure to follow job requirements or instructions, as outlined by manager, supervisor, manual, handbook and/or job description). (Unsatisfactory work performance, including but not limited to , demonstrating a negative attitude and/or unwillingness to work as part of a team.*

**You are expected to follow all polices and procedures as set forth by Morgan Properties. Failure to do so will result in further disciplinary action up to and including termination.**

By my signature below, I acknowledge that I have received a copy of this notice and that I understand the information contained within.

Dated: 6/12/08    Employee Signature: _____

Dated: 6/12/08    Property Manager: _____

Employee Comments: 

_____

_____

Regional Manager _____ Date: _____
Debbie Quigley

# MORGAN PROPERTIES

160 Clubhouse Road, King of Prussia, PA 19406
Phone (610) 265-2800    Fax (610) 265-5889

## *Memo*

To:         Teena Disantis
From:       Billie-jo Sedlacek, Property Manager
Date:       September 12, 2008
Subject:    Final Warning – Failure to Follow Supervisory Instruction, Unsatisfactory Job Performance

Teena, the success of any Morgan Properties Community is highly dependent upon our ability to work efficiently and in a timely fashion according to the directives of our supervisors and the SSOPs put in place for effective operations. It is for this reason that I have concerns of your effectiveness as the leasing consultant at Brookmont Apartments. As you know, Brookmont Apartments is a two-person office and the tasks that are assigned to you in your position must be completed timely and efficiently. You have failed to adhere to the standards, policies and procedures put in place per my instructions as well as Morgan's SSOPs.

### Attendance and Punctuality

On Wednesday, August 27, 2008, you asked if you could take a day off on Tuesday, September 2, 2008, for personal reasons. The schedule was rearranged to accommodate this for you. During that same week on Thursday, September 4, 2008, you had asked for ½ a day off for personal reasons on Friday, September 5, 2008. I had asked what you needed the time off for on such short notice and you advised me that you just needed some time off. I advised you to contact Alice and see if she was able to work, if she was able to cover for you, I would be able to accommodate your request, however, Alice was not available, so it was agreed that you would pick another day due to such short notice and it was the beginning of the month. Friday morning, September 5, 2008 you contacted me at home and told me that you really needed to take the day off. I advised you that I was disappointed since we spoke about this the day before and I was not able to approve this, I had no coverage in the office on a Friday during the first of week of the month.

*Morgan Properties (Employee handbook) Page 52, under VACATION TIME states, "An employee is required to obtain prior approval from his/her manager before scheduling time away from work. Every effort will e made to accommodate an employee's request for vacation. However, business needs may necessitate a change of plans in some instances.  Vacation requests must be submitted in writing on a leave request form at least one month prior to your preferred vacation dates and no later than June 30th.*

### Failure to Follow Supervisory Instruction

On August 29, 2008, you were asked to walk two units scheduled for move in (O9 and B1). On Saturday, the new move in for B1 picked up her keys and went to her apartment to find a back up in her bathtub. Maintenance had to be called out on emergency and fix the drain and clean the tub. If you had walked this apartment as requested, this problem would have been corrected prior to the move in taking place. When you were asked about these two apartments, you advised me that you forgot. This is a grave concern as it could have potentially cost Brookmont Apartments a resident.  Additionally, this could potentially put a strain on our relationship with the resident going forward.

### Unsatisfactory Job Performance

As the leasing consultant, your primary focus should be the facilitation of the leasing apartments. This includes and is not limited to call backs, marketing, move-in packets, brochures, walking all units prior to move in to ensure a satisfied resident and positive move in experience. I have prepared a daily check list for you to help assist you in remembering the daily, weekly and monthly tasks assigned to you.  I am


DEFENDANT'S EXHIBIT
5

concerned, because you are not u___ ___ this checklist daily and the items o___ ___ list are essential to your position as a leasing consultant at Brookmont Apartments.

*Morgan Properties (Employee handbook) Page 15, under DISCIPLINARY ACTION states, "Most problems and misunderstandings can be resolved between an employee and his or her supervisor. However, it is sometimes necessary for the Company to take formal disciplinary action. Except in the event of a major infraction, an employee will be warned that his or her conduct is unacceptable and will be encouraged to correct the problem. Minor infractions generally involve substandard work or a violation of Company policy that in the Company's judgment does not present a threat of immediate harm to the Company, its customers, or employees. Examples of minor infractions include, but are not limited to ...*

- *Unsatisfactory work performance, including but not limited to, demonstrating a negative attitude, poor customer service and/or unwillingness to work as part of a team*
- *Failure to follow job requirements or instructions, as outlined by manager, supervisor, manual, handbook and/or job description*

*A major infraction is conduct that, in the Company's judgment presents a threat of immediate harm to the Company, its customers or employees. An employee who commits a major infraction is subject to immediate discharge. Examples of major infractions include, but are not limited to the following:*

- *Gross neglect of job responsibilities*
- *Physical or verbal assault upon a Morgan Properties' employee or customer*
- *Repeated minor infractions*

Teena, you have now worked with Morgan Properties for two years and should be very familiar with our policies, procedures and expectations. Please consider this your final warning, as you are required to adhere to all policies and procedures and to complete all duties in a timely and accurate fashion as assigned. Failure to do so or failure to follow instructions as outlined by this memo, the employee handbook, SSOP, community regulations and by your Supervisor will result in immediate termination of your employment.

**You are expected to follow all polices and procedures as set forth by Morgan Properties. Please consider this document to be confirmation of written warning issued to you by Billie-jo Sedlacek on September 12, 2008 regarding failure to follow supervisory instruction and unsatisfactory job performance.**

_____
*Employee Signature*      Date 9-17-08

_____
*Manager Signature*      Date 9-12-08

_____
*Regional Manager Approval*      Date: _____

_____
*Witness Signature*      Date: _____

D0191

**From:**          Krista Reynolds
**Sent:**           Thursday, October 02, 2008 12:41 PM
**To:**              'Jennifer Carreon'
**Subject:**      FW: Need to know about FMLA

```
Krista L. Reynolds, PHR
Human Resources Director
(610) 945-1530   Phone
```

---

**From:** Teena DiSantis [mailto:tdisantis@morgan-properties.com]
**Sent:** Thursday, October 02, 2008 12:37 PM
**To:** Krista Reynolds
**Subject:** Need to know about FMLA

Hello, Krista!

I am not sure if you are the one that I have to contact about FMLA. I needed to know if it ran out yet. I also wanted to know how much time I have left for Vacation/Personal/Sick. See I used a personal day 09/19/2008 and then in July I used time for vacation, and they charged me for one day a full 8 hours when I left @ 3pm to start my vacation when they should have only charged me 3 hours. This personal day that I took in Sept. was not yet documented because payroll already went in that week.

If you can contact me back about the FMLA and even fax me the paperwork I need to provide to my doctor. I'm just taking a precaution, just in case he tells me it's something serious or simple.


Teena DiSantis
Brookmont Apartments



1

sign over your jury duty compensation check(s) to Morgan Properties. Employees are expected to return to work immediately if they are excused from court during any part of the workday.

Employees appearing as a plaintiff, defendant, or witness in matters not related to company business will not receive paid time off. Vacation time may be used for these instances.

### Military Leave

Morgan Properties supports employees who meet their military obligations by granting a leave of absence together with re-employment rights as provided by federal and state laws. An unpaid military leave of absence shall be granted to eligible employees who are members of the uniformed services of the United States and are called to voluntary or involuntary service, including active duty, inactive duty, active duty for training, time spent taking fitness for duty examinations and performing funeral honors duty. Employees on military leave may elect to use accrued vacation or personal time in lieu of unpaid leave.

Health benefits will continue at no cost to the employee for the first thirty (30) days of military leave. After thirty (30) days, the employee may continue the coverage at the employee's expense, at the same rates paid by the Company, unless the employee suffers an injury in the line of duty.

The employee must return to work within ninety (90) days following the satisfactory completion of military service. Employees returning from military leave must provide appropriate military documentation regarding the purpose and duration of the leave. The employee will be reemployed in the job that they would have held if they had remained continuously employed, or to a position of equivalent seniority, status and pay. Failure to return to the Company in a timely manner after release from service may result in a refusal of reemployment. Reemployment may also be denied if the Company's circumstances have changed to the extent that reemployment is unreasonable or if the employee was separated from the uniformed service by an undesirable, bad conduct or dishonorable discharge.

### Sick Leave

Morgan Properties advances each employee a total of five paid sick days on January 1 of each year. Sick days are an unearned benefit provided at Morgan Properties' discretion. Sick days are intended to cover absence from work due to medical reasons. These days are allotted at a rate of .417 days per calendar month.

Employees are required to contact their immediate supervisor at least one hour prior to the start of their shift if calling in sick. If an employee is unable to reach their immediate supervisor, they should contact the next designated manager until speaking with someone personally. Voice mail messages are not acceptable.

Morgan Properties will require a Doctor's note for illnesses that require you to use sick time in excess of three consecutive days or if misuse of attendance has been determined.

If your sick days are not used in the current calendar year, you may bank any unused sick days into the next calendar year. A total of fifteen (15) days may be accumulated in your extended sick leave bank. The sick days that are carried over into your extended sick leave bank can only be used in conjunction with a doctor's certification. The use of this extended sick leave bank is for employees to have extended sick leave for unexpected and long-term periods of illness and not to be used for single day uses without proper doctor certification.


DEFENDANT'S
EXHIBIT

ALL-STATE LEGAL®

L

MORGAN PROPERTIES

EMPLOYEE HANDBOOK OF COMPANY POLICIES

Employees who wish to use sick days will be asked to sign an agreement for repayment of any unaccrued sick days to the company, in the event that an employee leaves the company prior to accruing this time. In the event of termination of employment for any reason, any used but unaccrued sick time will be deducted from the employees final paycheck.  If an employee leaves the company and has accumulated sick leave, the Company will not pay for those days.  There are no cash value payouts on sick days.

**Vacation Time**

Morgan Properties provides all regular full-time employees with paid vacation time.  Regular full-time employees are eligible for vacation and begin accruing vacation time on the first of the month following 30 days of employment.  Vacation is an unearned benefit provided at Morgan Properties' discretion. Vacation accrual limits are as follows:

| Years of Service | Annual Vacation Days | Maximum Monthly Accrual Schedule |
|---|---|---|
| First calendar year | Based on date of hire | 1 day |
| Less than 5 years | 12 days | 1 day |
| 5 – 9 years | 17 days | 1.42 days |
| 10 years or more | 22 days | 1.83 days |

Vacation is accrued on a pro-rata monthly basis, subject to date of hire and the eligible amount of annual entitlement.  An employee must be actively at work for the full calendar month of his/her regularly scheduled hours in that month to accrue that month's vacation entitlement.  The annual vacation year begins January 1 and ends on December 31.  No vacation time for the current year will be accrued or advanced for employees whose start date is after November 1st.

Scheduling
Morgan Properties advances vacation days so employees may use time prior to actually accruing it. Employees who choose this option will be asked to sign an agreement for repayment of any unaccrued vacation days to the company, in the event that an employee leaves the company prior to accruing this time.

An employee is required to obtain prior approval from his/her Manager before scheduling time away from work.

Every effort will be made to accommodate an employee's request for vacation.  However, business needs may necessitate a change of plans in some instances.  Vacation requests must be submitted in writing on a Leave Request Form at least one month prior to your preferred vacation dates and no later than June 30th. Any employee hired after June 30th must submit their vacation request 30 days in advance.

In considering requests, workload and staff availability are carefully reviewed.  In the event of a conflict, preference will be given on a first come first served basis.  If requests are simultaneous, preference will be given according to length of service.

Paid vacation is intended as a time for rest, relaxation, and a change of pace.  You are encouraged to use your vacation days.  There is no cash value for vacation time.  If you have unused vacation time at the end of the calendar year, the time is lost and not carried over to the next year.

If it becomes necessary due to operational demands to cancel approved scheduled vacation time, you may request to carry over the unused time into the new year, provided that the Regional Vice President and Human Resources Director approves this request in writing.

D0037

> *This information must be given to the employee who is being placed on Family and Medical Leave or who has requested Family Medical Leave*



# M MORGAN PROPERTIES

### 160 Clubhouse Road, King of Prussia, PA 19406
### Phone (610) 265-2800          Fax (610) 265-2417

## Memo

**TO:**          Teena Disantis

**FROM:**      Jennifer Carreon, Human Resources Assistant

**DATE:**      October 6, 2008

**SUBJECT:**  **Federal Family and Medical Leave Act**

---

Teena, it has been brought to my attention that you have a non-work related illness and/or injury that may qualify for leave under FMLA. We will assign you leave under FMLA pending completion of the attached paperwork.

Please complete the *FMLA Leave Request Form*.  Also complete the top portion of the front page of the *Certification of Health Care Provider Form*.  Include the employee's name and department, or if applicable, the patient's name and relationship to the employee.  The attending physician must complete the remainder.

Various medical conditions are appropriate for *Family and Medical Leave*, such as, heart conditions, pregnancy, childbirth, miscarriage, back problems, appendicitis, emphysema or continuing treatment for chronic or long-term health conditions.  Some conditions which would not be appropriate under *the Family and Medical Leave Act (FMLA)* are short-term conditions for which treatment and recovery are brief or the care of a child for illnesses such as colds or flu.

It is the responsibility of the employee to submit the completed forms to Human Resources within *15 days* of the time when the employee made the supervisor aware that he/she needs to be on extended medical leave which *may* qualify under the *Family and Medical Leave Act*.  Completed forms should be returned to:  **Human Resources, Morgan Properties, 160 Clubhouse Road, King of Prussia, PA 19406**

Outlined below is an explanation of the Family Medical Leave Act.

## FEDERAL FAMILY AND MEDICAL LEAVE ACT ("FMLA")
The Federal Family and Medical Leave Act provides eligible employees with up to 12 weeks of leave For the birth and care of a newborn child; For the placement of a son or daughter with the employee for adoption or foster care; to care for a spouse, parent or child with a serious health condition; or when the employee is unable to work because of a serious health condition.

### *Eligibility*
To quality for federal Family and Medical Leave an employee must have 12 months of employment and 1,250 hours of work within the previous consecutive 12 month period and work at a location where at least 50 employees of your employer are working within 75 miles. *If you are ineligible for leave under FMLA, you may be eligible for an unpaid Medical Leave of Absence.*



DEFENDANT'S EXHIBIT

M



# MORGAN PROPERTIES

160 Clubhouse Road, King of Prussia, PA 19406
Phone (610) 265-2800    Fax (610) 265-5889

## _Memo_

To:         Teena Disantis File
From:    Billie-Jo Sedlacek, Property Manager
Date:      October 10, 2008
Subject:  Teena Disantis Exit Notes

On October 2, 2008, Teena called and left a message on my cell phone that she needed me to call her about something important, then she proceeded to say that she was not feeling well and she really needed the day off.  This message was left around 7:55 am.  I did not retrieve the message to approximately 8:45am at which time; I contacted her via phone to ask her what was wrong.  She told me that she was already at the office and that she was not feeling well and wanted to at least take ½ day.

I contacted Alice Serrota to see if she was able to come in for the day and on such short notice, she was not able to.  Throughout the morning, I over heard Teena on the phone with her boyfriend about how concerned she was that his father was coming into town today and she did not want him to have to be at the house by himself.  Later in the morning, I asked Teena if her boyfriend's dad was coming into town and she said yes and her house was a mess and really needed it to get cleaned before he got there.  A little while later, Teena came into my office and told me that she was really not feeling well and wanted to know if she could take the rest of the day off.  I told her that I do not have anyone to cover and I have several meetings with residents throughout the day and we were having a staff meeting/safety trainer in the afternoon.  I advised her that she needed to stay for the remainder of the day.   I came out of my office to see her with her head down on her desk and not doing anything productive, I told her to go home.  She clocked out and went home at 12:46pm.

Teena returned to work on Saturday, October 4, 2008.  There was a scheduled move in for this date that needed to change his move in date, I asked Teena to move him to a wait list and assign his unit to another future resident.  This was not done.  When asked why, she simply said that she forgot.

Additionally, the resident of K09 phoned in a work order for his bathroom tiles falling down and a tub leak.  Teena never put this work order into the system.  When asked why, she simply said that she forgot.

Teena was also asked to send maintenance to U06 on Wednesday, October 8th at 4:30, because I was going to be at a manager's meeting.  Teena again forgot to follow through with this assignment.

Teena was released from her position of Leasing Consultant at Brookmont Apartments on October 10, 2008.  During this meeting, Kristin Bozarth sat in as a witness, Debbie Quigley was on vacation.  Teena was called into the manager's office and I proceeded to discuss with Teena her performance.  I proceeded to give her the letter from H/R and advise her that as of October 10, 2008 she would no longer be an employee of Morgan Properties.  She stood up and told me that this is "bullshit" and that she has been doing her job and that I did not need to go over anything with her, that she would just leave."  I told her that I wanted to go over the letter with her because it involved her benefits.  She walked out of the manger's office and went to her desk to get her things.  I asked her for her keys and she gave them to me and left the office.



DEFENDANT'S
EXHIBIT

N

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TEENA DISANTIS                                     :        CIVIL ACTION
                                                   :
                Plaintiff,                         :        No. 09-CV-06153-RK
                                                   :
        v.                                         :
                                                   :
MORGAN PROPERTIES PAYROLL                          :
SERVICES, INC.                                     :
                and                                :
MITCHELL L. MORGAN                                 :
MANAGEMENT, INC.                                   :
                and                                :
MITCHELL L. MORGAN PROPERTIES                      :
LTD.                                               :
                                                   :
                Defendants.                        :

**PLAINTIFF'S RESPONSES TO DEFENDANTS'
FIRST SET OF INTERROGATORIES**

Plaintiff, Teena DiSantis, by and through her undersigned counsel, hereby responds to

Defendants' First Set of Interrogatories as follows:

I.      **RESPONSES**

        A.      **General Objections.**

                1.      Plaintiff generally objects to Defendants' First Set of Interrogatories to the

extent they are ambiguous, vague, over-broad and/or unduly burdensome.

                2.      Plaintiff generally objects to Defendants' First Set of Interrogatories to the

extent they improperly call for information protected by the attorney-client privilege and/or the

attorney work-product doctrine.

1



-Billy Joe Sedlacek (Agent of Defendants - Manager)
Agent can provide information related to Plaintiff's employment with Defendants,
Plaintiff's health condition(s) and Plaintiff's termination of employment. Agent's
address and telephone number are unknown.

-Sabina Chatterjee (Agent of Defendants - Manager)
Agent can provide information related to Plaintiff's employment with Defendants,
Plaintiff's health condition(s) and Plaintiff's termination of employment. Agent's
address and telephone number are unknown.

-Eileen Chuck (Agent of Defendants – Co-worker)
Agent can provide information related to Plaintiff's employment with Defendants,
Plaintiff's health condition(s) and Plaintiff's termination of employment. Agent's
address and telephone number are unknown.

-Dr. Anthony J. Mannino (Plaintiff's Doctor)
1 Sugar Maple Lane, Levittown, PA 19055; (215) 945-8400
Can provide information regarding Plaintiff's medical/mental health conditions,
her treatment and need for time off/medical leave.

2.     Neither Plaintiff nor her counsel has had any contact with past or present
employees of Defendants since her termination.

3.     Plaintiff objects to Defendants' Interrogatory No. 3 to the extent that it improperly
seeks information that is not relevant to any of the issues in this dispute, and/or is not reasonably
calculated to lead to the discovery of admissible evidence. Without waiving the foregoing
objection, Plaintiff has not been a party in any other suit or claim.

4.     Plaintiff has not yet made a determination regarding who she intends on calling as
a witness in this matter.

5.     Plaintiff objects to Defendants' Interrogatory No. 5 to the extent that it is
ambiguous, vague, broad and/or unduly burdensome. Without waiving the foregoing objection,
Plaintiff refers Defendants to documents bates stamped P45 through P47.

6.     Plaintiff objects to Defendants' Interrogatory No. 6 to the extent that it is
ambiguous, vague, broad and/or unduly burdensome. Without waiving the foregoing objection,

4

Plaintiff is unable to remember each and every week in which she worked overtime and was not paid at an overtime rate. Plaintiff does state that she regularly worked a Tuesday through Saturday schedule from approximately 8:50am-9:00am to 5:30pm-6:00pm.

7.     Plaintiff objects to Defendants' Interrogatory No. 7 to the extent that it is ambiguous, vague, broad and/or unduly burdensome. Without waiving the foregoing objection, Plaintiff informed managers Sabina Chatterjee and Billy Joe Sedlacek that she was not being paid appropriately.

8.     Plaintiff has not yet made a determination regarding who she intends on calling as a witness in this matter.

9.     Plaintiff has not yet made a determination regarding exhibits she may use at trial in this matter.

10.     Plaintiff has not yet made a determination regarding who she intends on calling as an expert witness in this matter.

11.     Plaintiff objects to Defendants' Interrogatory No. 11 to the extent that it is ambiguous, vague, broad and/or unduly burdensome. Without waiving the foregoing objection, Plaintiff has sought employment through her local newspaper, the internet and PA Careerlink.

12.     Plaintiff objects to Defendants' Interrogatory No. 12 to the extent that it is ambiguous, vague, broad and/or unduly burdensome. Without waiving the foregoing objection, Plaintiff has specifically sought employment from the following:

> -Name: M&T Bank
> Address: 1817 Street Road, Bensalem, PA 19020
> Date: In or about 2009
> How: In person
> Interview/Offer: N/A
> Salary: N/A

## Earnings Statement

**Teena Marie Disantis**

**1152 Becerly Ave**

**Apt A**

**Bensalem, PA 19020**

| Co | File # | Wk | Pay Date | Period End | Paid Dept | Paid Clock | Gross Pay | Net Pay | Check # | Chk/Vcr | Void |
|----|--------|-----|----------|------------|-----------|------------|-----------|---------|---------|---------|------|
| DNR | 5520 | 41-1 | 10/13/2006 | 10/06/2006 | 901301 | | 800.00 | | 00410301 | Voucher | |

| Earnings | Rate | Hours | This Period |
|----------|------|-------|-------------|
| Regular | | 72.00 | 720.00 |
| 4 Hrs Sun | 10.00 | 8.00 | 80.00 |
| Gross Pay | | | $800.00 |

| Deductions | Statutory | |
|------------|-----------|-----|
| | Federal Income Tax | -11.94 |
| | Medicare | -10.57 |
| | Social Security | -45.20 |
| | 0104 Worked In Locality Income Tax | -34.41 |
| | 59 SUI/SDI | -0.72 |
| | PA Worked In State Income Tax | -22.38 |
| | **Others** | |
| | IBC HMO | -53.00 |
| | Rent (Other) | -412.43 |
| | Dental 125 Cafe | -18.00 |
| | Checkings | -191.35 |
| | Net Pay | |

| Memos | |
|-------|-----|
| Regular Earnings | 800.00 |



**Morgan Properties**

**Weekly Time Sheet**

8

Property: SHERWOOD

Name: Teena DiSantis

9/29/2006

## Week One

| Week Day | Date | Time In | Time Out | Regular Hours | Sunday | Vacation | Sick | Floating Holiday | Holiday | Funeral | Jury | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Saturday | 9/23/2006 | 4:00 | 8:00 | 6 | | | | | | | | |
| Sunday | 9/24/2006 | 12:45 | — | 4 | | | | | | | | |
| Monday | 9/25/2006 | 9:45 | 1:30 | 6:00 | 8 | | | | | | | |
| Tuesday | 9/26/2006 | 9:00 | 2:37 | 11:20 | 8 | | | | | | | |
| Wednesday | 9/27/2006 | 9:45 | 12:50 | 4:00 | 8 | | | | | | | |
| Thursday | 9/28/2006 | | | | | | | | | | | |
| Friday | 9/29/2006 | | | | | | | | | | | |
| **Total Hours** | | | | | | | | | | | | |

## Week Two

| Week Day | Date | Time In | Time Out | Regular Hours | Sunday | Vacation | Sick | Floating Holiday | Holiday | Funeral | Jury | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Saturday | 9/30/2006 | 6:00 | — | 5:00 | 8 | | | | | | | |
| Sunday | 10/1/2006 | 12 | — | 4:00 | 4 | | | | | | | |
| Monday | 10/2/2006 | | | | | | | | | | | |
| Tuesday | 10/3/2006 | 4:00 | 11:51 | 1:18 | 8 | | | | | | | |
| Wednesday | 10/4/2006 | 4:00 | | 6:00 | 8 | | | | | | | |
| Thursday | 10/5/2006 | 4:00 | | 6:00 | 8 | | | | | | | |
| Friday | 10/6/2006 | | | | | | | | | | | |
| **Total Hours** | | | | | | | | | | | | |

_____ Total Hours during pay period

_Teena DiSantis_
Employee Signature

_____
Supervisor Signature

FAX No. 12156329140                                      P. 001/018

No. _____          Week
                                     Ending 9-29-06

Name _____Jesus Di Santis_____

| | | | |
|---|---|---|---|
| **MON** | AM | IN | SEP 25 AM 8:41 |
| | | OUT | SEP 25 PM 1:20 |
| | PM | IN | SEP 25 PM 1:36 |
| | | OUT | SEP 25 PM 6:01 |
| **TUE** | AM | IN | SEP 26 AM 8:55 |
| | | OUT | SEP 26 PM 2:37 |
| | PM | IN | SEP 26 PM 3:07 |
| | | OUT | SEP 26 PM 6:03 |
| **WED** | AM | IN | SEP 27 AM 9:00 |
| | | OUT | SEP 27 PM 12:25 |
| | PM | IN | SEP 27 PM 12:50 |
| | | OUT | SEP 27 PM 6:10 |
| **THU** | AM | IN | |
| | | OUT | |
| | PM | IN | |
| | | OUT | |
| **FRI** | AM | IN | |
| | | OUT | |
| | PM | IN | |
| | | OUT | |
| **SAT** | AM | IN | SEP 23 AM 9:03 |
| | | OUT | SEP 23 PM 5:00 |
| | PM | IN | |
| | | OUT | |
| **SUN** | AM | IN | SEP 24 PM 12:02 |
| | | OUT | |
| | PM | IN | SEP 24 PM 4:00 |
| | | OUT | |

SIGNATURE _____
TOPS Form 1291 (830391-1)          MADE IN U.S.A.

FAX No. 12156329140                    P. 008/018

| | | | |
|---|---|---|---|
| No. | | Week Ending | 10/06/06 |
| Name | | Irene Ai Santos | |

| | | | |
|---|---|---|---|
| **MON** | A M | IN | |
| | | OUT | |
| | P M | IN | |
| | | OUT | |
| **TUE** | A M | IN | OCT 3 AM 8:51 |
| | | OUT | OCT 3 PM 12:57 |
| | P M | IN | OCT 3 PM 1:18 |
| | | OUT | OCT 3 PM 5:01 |
| **WED** | A M | IN | OCT 4 AM 8:50 |
| | | OUT | |
| | P M. | IN | |
| | | OUT | |
| **THU** | A M | IN | |
| | | OUT | |
| | P M | IN | |
| | | OUT | |
| **FRI** | A M | IN | |
| | | OUT | |
| | P M | IN | |
| | | OUT | |
| **SAT** | A M | IN | SEP 30 AM 9:02 |
| | | OUT | |
| | P M | IN | SEP 30 PM 5:00 |
| | | OUT | |
| **SUN** | A M | IN | OCT 1 AM 11:58 |
| | | OUT | |
| | P M | IN | OCT 1 PM 4:10 |
| | | OUT | |

SIGNATURE

TOPS Form 1291 (830331-1)                    MADE IN U.S.A.

**Earnings Statement**

**Teena Marie Disantis**

**1152 Becerly Ave**

**Apt A**

**Bensalem, PA 19020**

| Co | File # | Wk | Pay Date | Period End | Paid Dept | Paid Clock | Gross Pay | Net Pay | Check # | Chk/Vcr | Void |
|----|--------|-----|----------|------------|-----------|------------|-----------|---------|---------|---------|------|
| DNR | 5520 | 17-1 | 04/27/2007 | 04/20/2007 | 901301 | | 902.00 | | 00170298 | Voucher | |

| Earnings | | | Rate | Hours | This Period |
|----------|--|--|------|-------|-------------|
| Regular | | | | 60.00 | 812.00 |
| Bonus | | | | 0.00 | 90.00 |
| | | | | Gross Pay | $902.00 |

| Deductions | Statutory | |
|------------|-----------|---|
| | Federal Income Tax | -20.60 |
| | Medicare | -12.05 |
| | Social Security | -51.52 |
| | 0104 Worked In Locality Income Tax | -38.43 |
| | 59 SUI/SDI | -0.81 |
| | PA Worked In State Income Tax | -25.51 |
| | **Others** | |
| | IBC HMO | -53.00 |
| | Rent (Post-Tax) | -474.00 |
| | Dental 125 Cafe | -18.00 |
| | Checkings | -208.08 |
| | Net Pay | |

| Memos | | |
|-------|--|--|
| Eligible Wages | | 902.00 |
| Regular Earnings | | 812.00 |


DEFENDANT'S EXHIBIT
ALL-STATE LEGAL®

**Morgan Properties**

**Weekly Time Sheet**

8
Property: SHERWOOD

Name: Teena DiSantis

4/5/2007

## Week One

| Day | Date | Time In | Time Out | Time In | Time Out | Sunday | Vacation | Sick | Floating Holiday | Holiday | Funeral | Jury | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Saturday | 4/7/2007 | | | | | | | | | | | | |
| Sunday | 4/8/2007 | | | | | | | | | | | | |
| Monday | 4/9/2007 | 9:00 | 1:00 | 2:00 | 6:00 | 8 | | | | | | | |
| Tuesday | 4/10/2007 | 9:00 | 12:30 | 1:30 | 6:00 | 8 | | | | | | | |
| Wednesday | 4/11/2007 | 9:00 | 1:00 | 2:00 | 6:00 | 8 | | | | | | | |
| Thursday | 4/12/2007 | 9:00 | 12:30 | 1:30 | 6:00 | 8 | | | | | | | |
| Friday | 4/13/2007 | 9:00 | 12:30 | 1:30 | 6:00 | 8 | | | | | | | |
| Total Hours | | | | | | | | | | | | | |

## Week Two

| Day | Date | Time In | Time Out | Time In | Time Out | Sunday | Vacation | Sick | Floating Holiday | Holiday | Funeral | Jury | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Saturday | 4/14/2007 | 9 | | 5:00 | | 8 | | | | | | | |
| Sunday | 4/15/2007 | | | | | | | | | | | | |
| Monday | 4/16/2007 | 9 | 1 | 2 | 10:00 | 8 | | | | | | | |
| Tuesday | 4/17/2007 | | | | | | | | | | | | |
| Wednesday | 4/18/2007 | 9 | 1 | 2 | 6:00 | 8 | | | | | | | |
| Thursday | 4/19/2007 | 9 | 1 | 2 | 6:00 | 8 | | | | | | | |
| Friday | 4/20/2007 | 9 | | 5:00 | | 8 | | | | | | | |
| Total Hours | | | | | | | | | | | | | |

Total Hours during pay period

Employee Signature

Supervisor Signature

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this date a true and correct copy of the foregoing Brief in Support of Defendants' Motion for Summary Judgment was served electronically by the Court upon the following:

> Ari R. Karpf, Esq.
> Jeremy M. Cerutti, Esq.
> Karpf, Karpf & Virant
> 3070 Bristol Pike
> Bensalem, PA 19020
> (215) 639-4970

Date:  July  21, 2010          _____ */s/ Schaun D. Henry* _____
                                       Schaun D. Henry