**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| TEENA DISANTIS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No.  09-6153 |
| | : | |
| MORGAN PROPERTIES PAYROLL SERVICES, | : | |
| INC., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                                    **SEPTEMBER 16, 2010**

Presently before the Court is the Motion for Summary Judgment filed by Defendants

Morgan Properties Payroll Services, Inc. d/b/a Morgan Properties, Mitchell L. Morgan

Management, Inc., and Mitchell L. Morgan Properties, Ltd. (collectively "Defendants" or

"Morgan Properties").  For the following reasons, Morgan Properties' Motion will be granted.

**I.      BACKGROUND**

Teena DiSantis ("Plaintiff" or "DiSantis") is a former employee of Morgan Properties.

She was employed as a leasing consultant for the company from July 2006 until October 2008.[1]

From early 2007 through late 2008, DiSantis was allegedly suffering from a number of health

problems, including but not limited to, bi-polar disorder, severe anxiety, and panic disorder.  As a

result of her health issues, she took many periods of time off from work while she was employed

at Morgan Properties.  On October 10, 2008, DiSantis was terminated from her position for poor

---

[1] From April 2006 to July 2006, DiSantis worked for Morgan Properties as a leasing
agent through a staffing agency.

job performance and failure to follow company policy.

On December 28, 2009, Disantis filed her original Complaint in this Court. On January 13, 2010, she filed a five-count Amended Complaint which set forth claims against Morgan Properties for perceived or actual disability discrimination under the Americans with Disabilities Act ("ADA") (Count I), retaliation pursuant to the ADA (Count II), perceived or actual disability discrimination under the Pennsylvania Human Relations Act ("PHRA") (Count III), violations of the Family Medical Leave Act ("FMLA") for interference and retaliation (Count IV), and violations of the Fair Labor Standards Act ("FLSA") based upon unpaid overtime compensation.

At the start of her employment at Morgan Properties, DiSantis worked at a residential apartment complex known as Sherwood Crossing. DiSantis was one of two leasing consultants at this location. In her position, Plaintiff's responsibilities included: 1) performing all activities related to apartment rentals, move-ins, and lease renewals; 2) interacting directly with prospective and current residents to achieve maximum occupancy; 3) generating and handling traffic, leasing apartments, qualifying prospects, preparing lease documentation and completing move-in paperwork and procedures; and 4) assisting residents throughout their tenancies. (Defs.' Mem. Supp. Summ. J. Mot., Ex. B.) Pursuant to Morgan Properties' formal job description for a leasing consultant, competencies such as "organizational support" (i.e. "follows policies and procedures") and "attendance/punctuality" were important for anyone in the position. (Id.)

From July 2006 to March 2007, DiSantis reported to property manager Sabina Chatterjee ("Chatterjee") at the Sherwood Crossing location. On January 26, 2007, DiSantis requested leave due to a medical condition[2] unrelated to her alleged mental disorders. Plaintiff did not

---

[2] DiSantis underwent surgery for endometriosis on February 2, 2007.

qualify for FMLA leave because she had not been employed by Morgan Properties for at least twelve months. Nevertheless, Defendants granted Plaintiff's leave request for the period from February 1, 2007 through February 9, 2007.

Although DiSantis's leave was not FMLA-qualifying, Morgan Properties required her to complete FMLA forms – including a "Certification of Health Care Provider Form" ("Certification") – to verify her need for a medical absence. DiSantis was provided with FMLA paperwork on January 26, 2007. On February 9, 2007, when DiSantis returned to work, she was given an "Employee Warning Notice" ("First Warning Notice") by Chatterjee for "lack of professionalism" for failing to provide the forms in a timely manner and for recent unprofessional behavior in the office. (Id., Ex. D.) DiSantis signed an acknowledgment at the bottom of this First Warning Notice.

Subsequently, on March 15 and 16, 2007, DiSantis was absent from work. In this instance, her absences were related to her aforementioned mental health issues. On March 16, 2007, DiSantis was once again provided with the relevant FMLA forms. At this point, DiSantis still did not qualify for FMLA leave, but Morgan Properties granted her leave from March 16 through March 30, 2007.[3]

On March 19, 2007, DiSantis's physician, Dr. Anthony Mannino ("Dr. Mannino") completed the Certification and faxed it to Human Resources at Morgan Properties. On the Certification, Dr. Mannino stated that DiSantis had "severe anxiety" and "panic disorder" to

---

[3] At her deposition, DiSantis testified that Chatterjee repeatedly came to her apartment during this non-FMLA leave, banged on her door, and asked her when she would be returning to work. Notably, however, DiSantis also testified that she did not inform Chatterjee of her mental conditions until approximately May 2007.

justify her need for leave.  Further, on this form he checked the box "acute condition" as opposed

to the "chronic/permanent" box.  Most importantly, in the section of the form where it asked the

health care provider to identify the "probable duration of the condition," Dr. Mannino indicated

that the condition would last from March 16 through March 30, 2007.  Dr. Mannino also made it

clear that any need for continuing treatment would be based on additional medical evaluation.

(Id., Ex. F.)[4]

DiSantis was also apparently absent from April 2 until April 9, 2007.[5]  On April 10, 2007,

after her return to work, DiSantis was once again given an "Employee Warning Notice" ("Second

Warning Notice").  The Second Warning Notice stated:

> Description of Infraction:
>
> Regular and prompt attendance on each scheduled workday is essential.  ***Teena was a 'no call, no show' to work on Thursday March 15 and the morning of Friday March 16.***  On Friday afternoon Teena did contact Krista Reynolds, HR Director to discuss her situation.  Krista then notified me and Debbie Quigley [Defendant's Regional Property Manager].  Failure to notify us of your absence in a timely fashion results in short staffing on the site which prevents us from meeting our business objectives.
>
> Plan for Improvement:
>
> Per the Morgan Properties Employee Handbook of Company Policies, page 23: '***In the event of an unscheduled absence, such as illness or emergency, employees are required to contact their immediate supervisor at least one hour prior to the start of their shift*** . . . . If an employee is unable to reach their immediate supervisor, they should contact the next designated manager until speaking with someone personally.  Voicemail messages are not acceptable.

[4] DiSantis testified at her deposition that she was prescribed medications – Ativan and Abilify –  by Dr. Mannino for her mental illnesses.

[5] This period of absence is documented by a note from Dr. Mannino's office which merely stated:  "Please excuse Teresa's absences 04/02 through 04/09.  She is under care.  Thank you."  (Pl.'s Mem. Resp. Summ. J. Mot., Ex. R.)

(Id., Ex. G (emphasis added).)   DiSantis signed an acknowledgment at the bottom of this Second Warning Notice.

In or around July 2007, Kristin Bozarth ("Bozarth") became the new property manager at Sherwood Crossing after Chatterjee left.  On August 28, 2007, DiSantis contacted Human Resources about the possibility of taking additional leave for unknown reasons.  In response, a representative from the company sent her both short-term disability and FMLA paperwork.[6] Despite receiving the relevant forms, DiSantis never requested leave at this time.

In February 2008, while she remained a Morgan Properties employee, the company permitted DiSantis to transfer to another apartment complex location, Brookmont, to accommodate her child care needs.  She was the only leasing consultant at Brookmont.  Upon her arrival at this location, DiSantis was supervised by property manager Billie-Jo Sedlacek.  At her deposition, DiSantis testified that she did not make Sedlacek aware of her alleged mental illnesses until approximately two weeks before her termination.

Significantly, on June 11, 2008, DiSantis was issued a disciplinary action plan by Sedlacek because of performance and attendance related issues.   (Defs.' Mem. Supp. Summ. J. Mot., Ex. I.)  Like she did with the First and Second Warning Notices, DiSantis signed an acknowledgment at the bottom of this document.  (Id.)  DiSantis' attendance and job performance issues continued.  As a result, on September 12, 2008, Sedlacek gave DiSantis a written "Final Warning" for continued "attendance and punctuality" issues[7], failure to follow

_____

[6] At this point, DiSantis had been at the company long enough to qualify for FMLA leave pending completion of the appropriate paperwork.

[7] Specifically, the "Final Warning" discussed DiSantis's September 5, 2008 violation of a provision the of Employee Handbook related to vacation time.  According to the Final Warning,

supervisory instruction, and unsatisfactory performance.  DiSantis signed an acknowledgment at the bottom of this document as well.  (Id., Ex. J.)

On October 2, 2008, DiSantis emailed Human Resources Director Krista Reynolds ("Reynolds") and requested FMLA leave paperwork.  She wrote:

> Hello Krista!  I am not sure if you are the one that I have to contact about FMLA.  I needed to know if it ran out yet . . . . If you can contact me back about the FMLA and even fax me the paperwork I need to provide to my doctor.  I'm just taking a precaution, just in case he tells me it's something serious or simple.

(Id., Ex. K.)  On the same day, Sedlacek sent DiSantis home because she had her head down at her desk – after she previously requested half a day off from work and was declined.  DiSantis then missed work on October 3[8] and October 6, 2008 because of alleged sinusitis.  On October 6, 2008, Human Resources Assistant Jennifer Carreon ("Carreon") sent DiSantis the FMLA paperwork.

On October 7, 2008, Sedlacek wrote Reynolds the following email:  "Hi Krista, Have you heard anything from [DiSantis] today regarding FMLA – she has not mentioned anything to me and she was 1 hour late this morning due to her alarm not going off!"  (Pl.'s Mem. Resp. Summ. J. Mot., Ex. BB.)  In subsequent correspondence between Sedlacek and Reynolds, Sedlacek described DiSantis's conduct on October 2, 2008, confirmed that DiSantis was late for work on

---

DiSantis took that day off despite the fact her vacation request was denied by Sedlacek for business reasons on September 4, 2008.  This conduct was in violation of the "vacation time" provision of the Employee Handbook which states:  "An employee is required to obtain prior approval from his/her manager before scheduling time away from work . . . . Vacation requests must be submitted in writing on a leave request form at least one month prior to your preferred vacation dates . . . . (Id., Ex. J.)

[8] According to Morgan Properties, DiSantis failed to contact a manager personally at least one hour prior to the start of her shift on this date in violation of company policy.  (Id., Ex. L.)

October 7 because her alarm did not go off, and explained that DiSantis allegedly had a doctor's note for her recent absences. (Id.) On October 9, 2008, Sedlacek wrote:

> Hi Krista, Just checking in on this! I was at a manager's meeting yesterday. [DiSantis] still was unable to give me a doctor's note, she said that they were going to fax it yesterday and they did not. This morning she said that they would fax it today. Has she sent any paperwork back for FMLA?[9] I am trying to figure out coverage for the upcoming weeks, and for the manager's conference. Please let me know if I am able to terminate her at this point or if we will be extending FMLA to her.

(Id.) On October 10, 2008, DiSantis was terminated for her poor job performance and failure to follow company policy.[10]

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a

---

[9] DiSantis never submitted any FMLA paperwork before she was terminated.

[10] Sedlacek's exit notes in regard to the termination reference DiSantis's actions on October 2, 2008 and numerous performance-related issues that occurred during the previous week such as DiSantis's failure to phone-in a work order related to a resident's bathroom tub/tiles and failure to contact maintenance for another resident pursuant to Sedlacek's instructions.

dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

III. **DISCUSSION**

As previously discussed, DiSantis's Amended Complaint contains five counts. Defendants claim they are entitled to summary judgment on all counts. We agree and will now address each of the respective claims.

A. **Perceived/Actual Disability Discrimination Under the ADA and PHRA**

1. **Actual Disability Discrimination**

The McDonnell Douglas burden-shifting analysis applies to ADA claims.[11]  McDonnell

Douglas Corp., v. Green, 411 U.S. 792 (1973); see also Shaner v. Synthes, 204 F.3d 494, 500-01

(3d Cir. 2000).  Pursuant to this framework, the plaintiff must first establish a prima facie case of

discrimination by showing:  (1) she is a disabled person under the meaning of the ADA;  (2) she

is otherwise qualified to perform the essential functions of the job, with or without reasonable

accommodations from the employer; and (3) she has suffered an otherwise adverse employment

decision as a result of discrimination.  Shaner, 204 F.3d at 500.

In regard to the first prong, "[t]he ADA defines a disability as:  (A) a physical or mental

impairment that substantially limits one or more of the major life activities of an individual; (B) a

record of such impairment; or (C) being regarded as having such an impairment.  Heard v. St.

Luke's Hosp., No. 08-5494, 2009 WL 3081513, at *3 n.6 (E.D. Pa. Sept. 28, 2009) (citing 42

U.S.C. § 12102(2)).  A person is considered "substantially limited" when she is "[s]ignificantly

restricted as to the condition, manner or duration under which [she] can perform a particular

major life activity as compared to the condition, manner, or duration under which the average

person in the general population can perform that same major life activity."  29 C.F.R. §

1630.2(j)(1)(ii).  In analyzing whether an individual is substantially limited in a major life

activity, courts should examine "the nature and severity of the impairment; the duration or

expected duration of the impairment; and the permanent or long-term impact, or the expected

---

[11] The Court's analysis of the federal claims are equally applicable to the PHRA claims.
As the Third Circuit has stated, "[w]hile the Pennsylvania courts are not bound in their
interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII,
the ADA, or the ADEA . . . its courts nevertheless generally interpret the PHRA in accord with
its federal counterparts.  Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

permanent or long-term impact of or resulting from the impairment." Amorosi v. Molino, No. 06-5524, 2009 WL 737338, *4 (E.D. Pa. Mar. 9, 2009) (citing 29 C.F.R. § 1630.2(j)(2)(i)-(iii)).

In the instant case, DiSantis has failed to establish that she is a disabled person under the ADA. As an initial matter, despite Plaintiff's claims regarding her disorders, the relevant medical records in this case do not reflect that she suffered mental conditions that were indefinite in duration. "Mental conditions such as panic and anxiety disorders, depression and agoraphobia-when they occur on a chronic, non-transient basis-have been recognized by the Third Circuit as disabilities for purposes of the ADA and PHRA." Norman v. Univ. of Pittsburgh, No. 00-1655, 2002 WL 32194730, at *5 n.2 (W.D. Pa. Sept. 17, 2002). "A temporary, transient, or nonpermanent impairment is not a disability that substantially limits a major life activity." Seibert v. Lutron Electronics, No. 08-5139, 2009 WL 4281474, at *5 (E.D. Pa. Nov. 30, 2009). Importantly, when Dr. Mannino filled out the FMLA Certification in March 2007, he made it clear that the "probable duration of the relevant condition[s]" was March 16 through March 30, 2007, and that any continuing treatment would be based on later medical evaluation. There is no medical testimony, documentation, or other evidence to support that DiSantis was suffering from her alleged mental conditions after this time.

In addition, DiSantis has not shown that her alleged mental disorders substantially limit her in any major life activity. Plaintiff broadly claims that "the major life activities that are substantially limited include: caring for her children, taking a shower, concentrat[ing] and playing with her children." (Pl.'s Mem. Resp. Summ. J. Mot. at 38.) At her deposition, DiSantis testified generally about the impact the alleged mental conditions have had on her life. (See, e.g., Defs.' Mem. Supp. Summ. J. Mot., Ex. E at 37:25-38:5 ("Not being able to control my mood

10

swings with my family and everyday life activity. I wouldn't be able to sometimes wake up and feed my son breakfast or get him off to school, or sometimes I never even felt like getting a shower for a day or two, or just like everyday life activities like that.").)

However, Plaintiff did not provide adequate information regarding how her alleged mental conditions impacted these activities and/or how that compared to how others in the general population conduct these activities. Namely, she did not sufficiently specify how the nature, duration, or extent of her activities were restricted by her purported bi-polar disorder, severe anxiety, and panic disorder. She did not provide adequate testimony that her difficulties rose to the level of substantially limiting her regarding any activity. Moreover, there is no documentary evidence that supports that DiSantis was "substantially limited" or "significantly restricted" from performing any major life activity due to her alleged mental issues. Thus, Plaintiff has not set forth a prima facie case of disability discrimination because she has failed to establish that she is disabled under the ADA.[12]

### 2. Perceived Disability Discrimination

DiSantis argues that "[e]ven if the Court concludes that [her] mental illnesses do not substantially limit a major life activity, the evidence demonstrates that Defendants perceived Ms. DiSantis as having a mental impairment that substantially limited a major life activity." (Pl.'s Mem. Resp. Summ. J. Mot. at 41.) Specifically, DiSantis argues that "the conduct of Defendants

---

[12] In addition, as will be discussed in detail below, DiSantis's claim would fail even if she could make out a prima facie case based on the the remainder of the McDonnell Douglas analysis. Specifically, Morgan Properties has produced evidence that it terminated Plaintiff for legitimate and non-discriminatory business reasons because of her long-term attendance issues, failure to follow company policies, and performance problems. Moreover, DiSantis has not produced sufficient evidence to show that these business reasons are pretextual. Fuentes v. Perski, 32 F.3d 759, 763 (3d Cir. 1994).

demonstrates that it viewed [DiSantis] as incapable of performing her job duties." (Id.) This claim also fails to survive summary judgment.

A person is "regarded as" having a disability if the person:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment.

Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 187-88 (3d Cir. 1999) (citing 29 C.F.R. § 1630.2(*l*)). "Such a claim does not focus on the plaintiff's actual abilities, 'but rather on the reactions and perceptions of the persons interacting or working with [her].'" Sarko v. Penn-Del Directory Co., 968 F. Supp. 1026, 1035 (E.D. Pa. 1997) (citing Kelly v. Drexel Univ., 94 F.3d 102, 108-09 (3d Cir. 1996)). The Third Circuit has stated that "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that the perception caused the adverse employment action." Kelly, 94 F.3d at 109. "Instead, the plaintiff must demonstrate that her employer 'perceived that not only did she suffer from a mental impairment, but that such [perceived] impairment substantially limited her ability to work.'" Sarko, 968 F. Supp. at 135 (citation omitted).

Here, there is no evidence that Morgan Properties perceived that DiSantis's alleged mental conditions made her incapable of performing her job duties or substantially limited her. DiSantis never had any job responsibilities taken away either before or after the company found out about any mental issues in March 2007. Contrary to Plaintiff's argument, the record

evidence shows that the company continued to show faith in DiSantis – even after she was written-up for disciplinary issues. In fact, in February 2008, the company displayed its trust in DiSantis's abilities when it allowed her to transfer from the Sherwood Crossing location, where there was another leasing consultant on the premises, to the Brookmont location, where she was the sole leasing consultant. Sarko, 968 F. Supp. at 109 (finding no evidence that defendant regarded the plaintiff as having a substantially limiting disability where it "trusted Plaintiff with the full range of duties performed by all of its sales representatives and actually offered her a promotion . . . ."). There is no triable issue regarding perceived disability discrimination. As a result, DiSantis's actual and perceived disability claims under both the ADA and PHRA will be dismissed at this stage in the litigation.

### B.     Retaliation Under the ADA and PHRA

DiSantis's retaliation claims should be analyzed under the McDonnell Douglas framework. Williams v. Phila. Hous. Auth. Police Dept., 380 F.3d 751, 759 n.3 (3d Cir. 2004). She must initially establish a prima facie case of retaliation. At that point, the burden shifts to Morgan Properties "to articulate some legitimate, nondiscriminatory reason" for its employment action. McDonnell Douglas, 411 U.S. at 802. Finally, if Morgan Properties carries its burden, DiSantis has an opportunity to show that the employer's non-discriminatory reason is pretextual. Id. at 804. At this stage of the framework, DiSantis's burden to show pretext merges with her ultimate burden of proving that Morgan Properties intentionally discriminated against her. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). DiSantis may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id.

at 256; see also Fuentes, 32 F.3d at 764.

## 1. Prima Facie Case

To set forth a prima facie case for retaliation, a plaintiff must show that "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995). In this case, DiSantis has established a prima facie case of retaliation under the ADA.

First, at the very least, DiSantis's inquiry regarding leave in early October 2008 qualified as a protected activity. Notably, "[a] plaintiff alleging unlawful retaliation need not be disabled within the meaning of the ADA." Hershgordon v. Pathmark Stores, Inc., No. 06-1234, 2007 WL 2142357, at * 5 (E.D. Pa. July 24, 2007). Thus, DiSantis's inability to establish that she is disabled under the ADA is not fatal to her retaliation claim. Id. Second, there was clearly adverse employment action because DiSantis was terminated. Third, for purposes of her prima facie case, DiSantis has established a causal connection between her participation in the protected activity and her termination based on the close proximity in time between when she inquired about leave on October 2, 2008 and her termination on October 10, 2008. McDonald v. Pa. Office of Atty. Gen., No. 08-0658, 2010 WL 1856030, at *14 (W.D. Pa. May 10, 2010) ("The Third Circuit has recognized that causation may be established by timing alone where the adverse employment action follows within days of the complaint of discrimination") (citing Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1999)).

## 2. Legitimate, Non-Discriminatory Reason

14

In regard to the second stage of the analysis, Morgan Properties has offered several legitimate, non-discriminatory reasons for terminating the Plaintiff. They have stated and offered evidence to support that DiSantis was fired for her "failure to follow her employer's instructions as well as failure to follow through with maintenance requests and failure to properly call off work according to the Company's policies." (Defs.' Mem. Supp. Summ. J. Mot. at 9.) These were the legitimate, non-discriminatory reasons to terminate DiSantis in October 2008 based on her extensive written disciplinary record, the fact she had received a disciplinary action plan in June 2008, and because she had received her "Final Warning" less than a month before she was fired.[13]

### 3.    Pretext

To establish pretext, a plaintiff must point to "some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764 (3d Cir. 1989). Plaintiff has failed to provide sufficient evidence of pretext.

DiSantis contends that Defendants' stated reasons for terminating her are contradictory or inconsistent. Thus, her pretext arguments appear to be based on the first prong above – that there are reasons to disbelieve Morgan Properties' articulated reasons. Regarding the first test, in order to offer sufficient evidence to discredit an articulated legitimate non-discriminatory reason,

---

[13] At her deposition, DiSantis complained that some of the statements in her disciplinary records were incorrect or untrue. However, she signed acknowledgments at the bottom of each of these disciplinary forms.

a plaintiff cannot merely show that the employer's decision was wrong or mistaken. <u>Id.</u> at 765. Instead, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence'. . . ." <u>Id.</u> (citation omitted).

In the instant case, DiSantis claims that there are inconsistencies regarding Morgan Properties' articulated reasons because she allegedly "complied with all of Defendants' work requirements" after she was given the "Final Warning" in September 2008. (Pl.'s Mem. Resp. Summ. J. Mot. at 33.) Of course, based on established Third Circuit law discussed above, to the extent DiSantis is arguing her employer was wrong or mistaken in regard to her termination, this argument is without merit. Further, when DiSantis was asked at her deposition about incidents that happened during her final week of employment that led to her termination – such as her failure to phone-in a work order related to a resident's bathroom tub/tiles and failure to contact maintenance for another resident pursuant to her supervisor's instructions – she only responded that she did not recall the incidents and not that they did not happen. (<u>See, e.g.</u>, Pl.'s Mem. Resp. Summ. J. Mot., Ex. E at 120:20-121:4 ("Q: 'Additionally, the resident of K09 phoned in a work order for his bathroom tiles falling down and a tub leak. [DiSantis] never put this work order into the system.' Do you remember that? A: I don't remember that, no. Q: Are you saying it didn't happen or you don't remember that? A: I'm saying that I don't remember that.").) This testimony surely does not contradict the termination reasons provided by Morgan Properties or establish any inconsistencies.

Further, DiSantis argues that a document that Morgan Properties submitted to the Unemployment Compensation Service Center regarding her termination casts doubts on the

company's articulated reasons. She points out that Morgan Properties "failed to include poor job performance as a reason for [her] termination" and "listed 'attendance policy violation' as the only reason for her separation from employment." (Id. at 34.) Plaintiff does not deny that her attendance policy violations were one of the reasons given for her termination. As the record indicates, DiSantis had attendance issues during both her final week of employment and at various times throughout her tenure at the company. Instead, DiSantis's apparent contention is that Morgan Properties' failure to include *all* reasons for her firing – on this one form – is evidence of pretext. This argument is without merit. Defendants' omission of a reason for DiSantis's termination does not establish any type of inconsistency and certainly does not create a jury question regarding the pretext issue.

Finally, Plaintiff contends that the fact that she was disciplined upon her return from medical absences establishes that the stated reasons for her termination are pretextual. DiSantis argues: "A reasonable jury may infer that Defendants' conduct of approving her absences and then disciplining her for those absences is inconsistent and contradictory and thus a pretext for retaliation." (Id. at 34.) The Court disagrees. The reasons for this discipline, whether they related to issues such as Plaintiff's lack of professionalism or failure to follow the company's attendance policies, were well-documented in written disciplinary records that DiSantis signed. The fact that the medical absences may have been approved did not make DiSantis immune from discipline. Thus, the disciplinary action is not evidence of pretext.

## C.     Interference and Retaliation Under the FMLA

### 1.     FMLA Interference

The FMLA was enacted by Congress in 1993 to help address problems stemming from "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4). The FMLA was designed to "balance the demands of the workplace with the needs of families" and "entitle employees to take reasonable leave for medical reasons." Id. § 2601(b); see also Callison v. City of Phila., 430 F.3d 117, 119 (3d Cir. 2005) (finding that one of the "primary purposes of the FMLA [is] to 'balance the demands of the workplace with the needs of families'"). The FMLA attempts to accomplish these purposes in a "manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(3).

The FMLA guarantees eligible employees of covered employers a total of up to twelve work weeks of leave per twelve-month period due to the birth or adoption of a child, the need to care for a spouse, son, or daughter because of their serious health condition, or due to the employee's own serious health condition rendering her unable to perform the functions of her position. Id. § 2612(a)(1). Pursuant to the FMLA, "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." Id. § 2615(a)(1).

To prove an FMLA interference claim, "the employee only needs to show that [she] was entitled to benefits under the FMLA and that [she] was denied them." Sommer v. The Vanguard Group, 461 F.3d 397, 399 (3d Cir. 2006). Specifically, a plaintiff must show that: (1) he was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the employer of his intention to take FMLA leave; and (5) the plaintiff was denied benefits to which

he was entitled under the FMLA.  Mascioli v. Arby's Rest. Group, Inc., 610 F. Supp. 2d 419, 429-30 (W.D. Pa. 2009).  As the Third Circuit has explained, "[a]n interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA."  Callison, 430 F.3d 117, 119-20 (3d Cir. 2005).  Thus, because an interference claim is not about discrimination, a McDonnell-Douglas burden-shifting analysis is not required when examining an interference claim like it is when considering a retaliation claim.  Mascioli, 610 F. Supp. 2d at 430.

An employee's rights under the FMLA are not without limitation.  An employee is not entitled "to a right, benefit or position to which the employee would not 'have been entitled had the employee not taken the leave.'"  Yandrisevitz v. H.T. Lyons, Inc., No. 08-1444, 2009 WL 2195139, at *9 (E.D. Pa. July 22, 2009) (citing 29 U.S.C.A. § 2614(a)(3)(B)).  "[I]f the employee is laid off and terminated while on FMLA leave, the employee has no right to reinstatement or the right to continue leave."  Mascioli, 610 F. Supp. 2d at 431; see also Moorer v. Baptist Mem'l Health Care Sys., 398 F.3d 469, 488 (6th Cir. 2005) ("'An employee lawfully may be dismissed preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave.'") (citation omitted).

In her briefing, DiSantis clarifies that her FMLA interference claims relate to her absences or requests for leave in September and October of 2008.  (Pl.'s Mem. Resp. Summ. J. Mot. at 25.)  In regard to the elements of an interference claim outlined above, the parties appear to agree that DiSantis was an eligible employee under the FMLA, that Morgan Properties was an employer subject to the FMLA's requirements, and that DiSantis gave notice of her intention to

take FMLA leave.  Mascioli, 610 F. Supp. 2d at 429-30.  However, they disagree that DiSantis

was entitled to FMLA leave and denied benefits to which she was entitled during the relevant

time frame.  Id.  The question at issue is whether DiSantis suffered from a "serious health

condition" under the FMLA during this period.

"Plaintiff must demonstrate [she] suffers from 'a serious health condition' that renders

[her] unable to 'perform the functions of the employee's position.'"  Schley v. Gloucester

Refrigerated Warehouse, No. 05-3270, 2007 WL 1237788, at *3 (D.N.J. Apr. 26, 2007) (quoting

29 U.S.C. § 2612(a)(1)(D)).  The FMLA statute defines a "serious health condition" as "an

illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a

hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care

provider."  29 U.S.C. § 2611(11).

The Federal Regulations state that a "serious health condition" involving continuing

treatment by a health care provider includes "chronic conditions."  29 C.F.R. § 825.115(c).  The

Regulations define a "chronic serious health condition" as one which:

> "(1) [r]equires periodic visits (defined as at least twice a year) for treatment by a
> health care provider, or by a nurse under direct supervision of a health care
> provider; (2) [c]ontinues over an extended period of time (including recurring
> episodes of a single underlying condition); and (3) [m]ay cause episodic rather
> than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

Id.

DiSantis contends that her mental disorders qualify as serious health conditions because

they require continuing treatment by a health care provider.  She claims they qualify as chronic

conditions because her illnesses:  "(1) require periodic visits for treatment by a health care

provider (Dr. Mannino); (2) continue over an extended period of time (and may involve recurring

episodes related to the underlying condition); and (3) may cause episodes related to the underlying condition rather than continuing incapacity." (Pl.'s Mem. Resp. Summ. J. Mot. at 21.)

DiSantis's contentions, however, lack the evidentiary support necessary to survive summary judgment. Outside of her self-serving testimony that she has bi-polar disorder, severe anxiety, and panic disorder, DiSantis has not offered any evidence to support her claim that these mental conditions required "continuing treatment by a health care provider" or qualified as chronic conditions.

In fact, on the only medical document in this case that mentions DiSantis's alleged mental conditions – Dr. Mannino's March 2007 Certification – the "acute condition" check box is checked rather than the "chronic/permanent" box. (Defs.' Mem. Supp. Summ. J. Mot., Ex. F.) Moreover, Dr. Mannino makes clear that the "probable duration of the relevant condition[s]" was March 16 through March 30, 2007 and that any continuing treatment would be based on later medical evaluation. (Id.) There is no record evidence, such as medical documentation, expert testimony, or affidavits, that indicates that her purported mental issues necessitated the requisite continuing treatment to qualify as serious health conditions under the FMLA. Thus, her FMLA inteference claim fails. Caskey v. Colgate-Palmolive Co., 535 F.3d 585, 591 (7th Cir. 2008) (affirming district court's finding that Plaintiff did not establish that her alleged anxiety and depression qualified as serious health conditions under the FMLA because "[plaintiff had an obligation to show a serious health condition, and her general testimony that her condition was serious [was] insufficient to raise a genuine issue of material fact on this issue"); Scobey v. Nucor Steel-Arkansas, No. 06-CV-0078, 2008 WL 110849, at *6 n.6 (E.D. Ark. Jan. 7, 2008)

("Plaintiff certainly has not demonstrated that his depression constituted a chronic condition as there is no evidence in the record that plaintiff ever sought or received treatment for depression following his three sessions of outpatient care in May 2005. Plaintiff's depression simply was not a condition that required periodic visits for treatment by a health care provider and continued over an extended period of time.").

## 2.    FMLA Retaliation

In order to prove FMLA retaliation, an employee must show that her employer intentionally discriminated against her for exercising an FMLA right. Mascioli, 610 F. Supp. 2d at 433. In the instant case, as there is only ***indirect*** purported evidence of FMLA discrimination, the Court analyzes the claim pursuant to the McDonnell Douglas burden-shifting analysis. 411 U.S. 792 (1973); see also Yandrisevitz, 2009 WL 2195139, at *10 ("Where, as here, there is only indirect evidence of a violation of the FMLA, courts in the Third Circuit apply the McDonnell Douglas burden-shifting framework.").

Pursuant to the McDonnell Douglas analysis, a plaintiff must first establish a prima facie case of FMLA retaliation by demonstrating: (1) she took FMLA leave; (2) she suffered an adverse employment action; and (3) there was a causal connection between her leave and the adverse action. Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004). Plaintiff has established a prima facie case because she initiated the process to take FMLA leave on October 2, 2008, suffered an adverse employment action when she was terminated on October 10, 2008, and set forth a causal connection because of the close proximity in time between the two events.

Nevertheless, consistent with the Court's analysis in the section of this Memorandum addressing ADA retaliation,[14] DiSantis's FMLA retaliation claim fails under the remainder of the McDonnell Douglas framework.  Morgan Properties has articulated and provided evidence of legitimate, non-discriminatory reasons to justify why DiSantis was disciplined in the past and eventually terminated on October 10, 2008.  In addition, Plaintiff fails to direct this Court to any "evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes, 32 F.3d at 764 (3d Cir. 1989).  As a result, DiSantis's FMLA retaliation claim will be dismissed.

### D.    Unpaid Overtime Compensation Claim Under the FLSA

In her Amended Complaint, DiSantis avers that she "worked for Defendants and often worked more than 40 hours in weeks of her employment from the start of her employment until the end of her employment."  (Amend. Compl. ¶ 43.)  Further, DiSantis pleads that "[d]uring her entire period of employment, regardless of whether [she] punched in or out from work, she was not paid for overtime at a rate of time and a half as required by the FLSA."  (Id. ¶ 46.)  In the instant Motion, Defendants claim that DiSantis's FLSA claim fails because she has not produced sufficient evidence to show that she "has in fact performed work for which she was improperly compensated" and "the amount and extent of that work as a matter of just and reasonable inference."  Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 678-88 (1986).  The Court

---

[14] The Court incorporates its analysis of the articulated legitimate, non-discriminatory reasons and pretextual arguments from that section of the Memorandum.

agrees with the Defendants for the reasons set forth below.

The FLSA states that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of [forty hours] at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The Supreme Court has outlined the burdens of the employer and employee when there is a claim for unpaid compensation under the FLSA. Mt. Clemens, 328 U.S. at 686-88. Specifically, "[a]n employee who brings suit . . . for unpaid minimum wages or unpaid overtime compensation, together with liquidated damages, *has the burden of proving that he performed work for which he was not properly compensated*." Id. at 686-87 (emphasis added). Notably, however, "'*where the employer's records are inaccurate or inadequate* and the employee cannot offer convincing substitutes' for those records, 'an employee has carried out his burden [at trial] if he proves that *he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference*.'" Harris v. Healthcare Servs. Group, Inc., No. 06-2903, 2008 WL 2789534, at *3 (E.D. Pa. July 18, 2008) (quoting Mt. Clemens, 328 U.S. 680, 687) (emphasis added). In this situation, "the burden of proof then shifts to the employer, who in order to prevail must 'come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.'" Id. (quoting Mt. Clemens, 328 U.S. 680, 687).

In this action, DiSantis asserts that the time-keeping records that Morgan Properties produced during discovery are "neither complete nor accurate." (Pl.'s Mem. Resp. Summ. J.

Mot. at 49.)  As a threshold matter, however, she does not specify why they are incomplete.  In contrast, Plaintiff attaches to her briefing over 100 pages of time-keeping records produced by the Defendants, but does not identify any records which are missing from her employment tenure. Moreover, outside of identifying a few purported errors in the records that she concedes are mere "mathematical errors" and pointing out some alleged inaccuracies regarding time-sheets she created and/or signed-off on, DiSantis does not direct the Court to any specific problems with the time-keeping records.  (Id.)  Thus, DiSantis has not convinced the Court that the Defendants' records are incomplete or inaccurate.[15]

Even if we assume that Morgan Properties' time-keeping records are inadequate or inaccurate, DiSantis has failed to produce sufficient evidence to sustain her FLSA claim.  As illustrated below, she relies solely on vague, conclusory, and speculative testimony to support her claim that she "often worked more than 40 hours in weeks of her employment from the start of her employment until the end of her employment."  (Amend. Compl. ¶ 43.)[16]  (See, e.g., Pl.'s Mem. Resp. Summ. J. Mot., Ex. E at 128:4-128:10 ("Q:  I guess my question for you is, do you have any specific week in which you believe you weren't paid overtime, or do you know when that is, or are you saying I think it must have happened, or what are we saying?  A:  No, it was

_____

[15] DiSantis does not argue that the time records alone support her claim for unpaid overtime compensation.

[16] Plaintiff does not deny Defendants' assertion that they made repeated requests during discovery for her to provide any basis on which they could calculate the number of overtime hours she allegedly worked.  In an Interrogatory Response to this type of inquiry, Plaintiff responded:  "Plaintiff is unable to remember each and every week in which she worked overtime and was not paid at an overtime rate.  Plaintiff does state that she regularly worked a Tuesday through Saturday schedule from approximately 8:50am-9:00pm to 5:30pm-6:00pm."  (Defs.' Mem. Supp. Summ. J. Mot., Ex. O.)

*pretty much* every week, especially at the end of Sabina's employment there.") (emphasis

added); <u>Id.</u> at 129:3-130:2 ("Q:  After May and June of 2007, any time after that when you think

you might have worked overtime and weren't paid or was it in those two months?  A:  Just for

the time I wasn't allowed to really take my full hour lunch.  Q:  Which was what time?  A:  A

couple times a week I wasn't allow to.  Like two times a week, like average.  Q:  Two times a

week for what period of time?  A:  Until I went to Brookmont, and even at Brookmont from June

to February.  Q:  From June to February?  A:  Yes.  Q:  You weren't taking any lunch?  A:  No,

*sometimes* I wasn't able to get a lunch.  We were just so busy, we weren't allowed to get a lunch.

Q:  Okay.  A:  And if I was on lunch, *sometimes* I'd have to stop eating lunch to go help

customers and clients.  Q:  Do you have any specific knowledge of what weeks you might

actually be missing time in?  A:  ***Almost every week***.") (emphasis added); <u>Id.</u> at 139:13-139:18

("Q:  If I were to ask you how much overtime do you think you worked while you were at

Morgan Properties, how many hours, do you have any idea?  A:  ***I have no idea***.  Like I said, it

was ***like a weekly basis*** I hardly ever got to take lunches, or I worked from 8:30 to 6:00 at

night.") (emphasis added).)

DiSantis's use of language such as "sometimes" and "pretty much" highlights the

vagueness of her testimony.  Further, her testimony is also scattered and inconsistent, as

evidenced by her references to "pretty much every week" and "almost every week" at some

points in her testimony when she attempts to specify when she worked unpaid overtime, as

compared to other parts of her testimony where she tries to narrow the time frame.  As many

federal courts have found, this type of evidence is insufficient at the summary judgment stage.

<u>Kolesnikow v. Hudson Valley Hosp. Ctr.</u>, 622 F. Supp. 2d 98, 118-19 (S.D.N.Y. 2009) ("First,

the only evidence concerning the amount of extra time [plaintiff] worked each week is her testimony that she "sometimes" worked an extra half hour when she worked through her lunch break . . . . Therefore, in the absence of evidence showing the amount of extra time . . . that she worked each week, [Plaintiff's] testimony does not provide sufficient basis to infer that she worked more than 40 hours in any given week."); Millington v. Morrow Cnty. Bd. of Comm'rs, No. 06-347, 2007 WL 2908817, at *7 (S.D. Ohio Oct. 4, 2007) ("Plaintiff's bare allegation that he worked an average of five hours every week at home is insufficient to meet his burden of proof . . . . Mere conclusory, factually unsupported allegations are insufficient to withstand a motion for summary judgment."); Daniels v. Finish Line, Inc., No. 07-1501, 2008 WL 4814008, at *3 (E.D. Cal. Oct. 31, 2008) (finding that Plaintiff could not survive summary judgment because he submitted no evidence beyond bare allegations and vague undocumented estimates to support his claim that his employer did not provide adequate compensation and that he was forced to work off the clock).  As the Kolesnikow court stated, "[w]hile there are cases in which FLSA plaintiffs have defeated summary judgment motions based on their own testimony, those plaintiffs have offered credible testimony *approximating* the number of hours they worked without pay."  Kolesnikow, 622 F. Supp. 2d at 119 (emphasis added).

Significantly, DiSantis's vague, speculative, and unsupported testimony would make it impossible for a reasonable jury to even approximate damages for her FMLA claim because she has failed "to show the amount and extent of [uncompensated work] as a matter of just and reasonable inference."  Mt. Clemens, 328 U.S. at 687.  The Court is not suggesting that Plaintiff had an onerous burden to establish her alleged damages with precision.  However, Plaintiff has failed to provide any estimate – or even factual foundation for an estimate – regarding the

number of alleged unpaid overtime hours that she worked.  This lack of sufficient evidence is fatal to DiSantis's FMLA claim at this stage of the litigation.  <u>Harris</u>, 2008 WL 2789534, at *5 ("Nevertheless, I will grant [Defendant's] motion for summary judgment because no reasonable jury could conclude on the basis of the record before me that sufficient evidence exists 'to show the amount and extent of that work as a matter of just and reasonable inference' . . . . Neither [plaintiff] provided an estimate of the hours of overtime allegedly worked for which he was unpaid.")

DiSantis's has failed to provide the requisite evidence that she "performed work for which [she] was not compensated" or produce sufficient evidence to show the "amount and extent of that work as a matter of just and reasonable inference."  Thus, summary judgment in Morgan Properties' favor is appropriate on the FMLA claim.

For the reasons set forth above, the Court finds that summary judgment in Morgan Properties' favor is appropriate as to all Counts of the Amended Complaint.

An appropriate Order follows.